# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v STOVALL

Docket No. 162425. Argued March 2, 2022 (Calendar No. 3). Decided July 28, 2022.

In 1992, Montez Stovall pleaded guilty in the Wayne Circuit Court to second-degree murder, MCL 750.317, and to possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant fatally shot two men in 1991 when he was a juvenile, and he pleaded guilty in exchange for the dismissal of first-degree murder charges. Pursuant to the plea agreement, defendant was sentenced to life in prison with the possibility of parole (parolable life) for murder, to be served consecutively to the mandatory two-year sentence for felony-firearm. Defendant moved to withdraw his plea in 1993, but the trial court denied the motion. Defendant later filed multiple motions for relief from judgment, which were also denied. In 2017, defendant again moved for relief from the judgment, arguing that his plea was illusory and that his sentences violated the Eighth Amendment of the United States Constitution pursuant to *Miller v Alabama*, 567 US 460 (2012), and *Montgomery v Louisiana*, 577 US 190 (2016), because his sentences effectively denied him a meaningful opportunity for release. The trial court, Kelly Ramsey, J., denied the motion, and the Court of Appeals denied leave to appeal. Defendant sought leave to appeal in the Supreme Court, which remanded the case to the Court of Appeals as on leave granted. 504 Mich 892 (2019). On remand, the Court of Appeals, SAWYER and METER, JJ. (GLEICHER, P.J., dissenting), affirmed the decision of the trial court. 334 Mich App 553 (2020). Defendant again sought leave to appeal in the Supreme Court, and the Supreme Court granted the application. 507 Mich 938 (2021).

In an opinion by Chief Justice MCCORMACK, joined by Justices BERNSTEIN, CAVANAGH, and WELCH, the Supreme Court *held*:

A sentence of life in prison with the possibility of parole for a defendant who committed second-degree murder while a juvenile constitutes cruel or unusual punishment and therefore violates Const 1963, art 1, § 16.

1. Defendant's successive motion for relief from judgment was not barred by MCR 6.502(G)(2) because it was based on a retroactive change in law. A retroactive change in the law must serve only as a foundation or base for a defendant's claim to overcome the procedural bar in the court rule. A narrower reading of the rule requiring that the defendant's claims fall squarely within a retroactive change in law would effectively merge the procedural hurdle in MCR

6.502(G)(2) with the merits inquiry in MCR 6.508(D), rendering one of those provisions nugatory. Because *Miller* and *Montgomery* served as the foundation or base for defendant's challenges to the constitutionality of his sentences, his motion was based on a retroactive change in law sufficient to overcome the procedural bar in MCR 6.502(G).

2. A defendant may be entitled to withdraw a guilty plea if the plea bargain was illusory, meaning that the defendant received no benefit from the agreement. Contrary to defendant's assertion here, it was not the case that he received no benefit from the plea agreement. Without a plea agreement, defendant could nevertheless have been sentenced to life without the possibility of parole if he had been convicted of first-degree murder; he just would have been entitled to a *Miller* hearing after *Montgomery* was decided in 2016. Defendant received the benefit for which he bargained: the possibility of being paroled that a conviction of first-degree murder might not have allowed.

3. The Eighth Amendment of the United States Constitution provides that "cruel *and* unusual punishments" shall not be inflicted on criminal defendants. In *Miller*, the Court held that mandatory sentences of life without the possibility of parole violate the Eighth Amendment and that a sentencing court must have discretion to sentence a juvenile offender to a lesser sentence after considering the mitigating qualities of youth. Defendant's Eighth Amendment challenge to his sentences under *Miller* failed; under *Montgomery*, a parolable life sentence for a juvenile offender does not violate the Eighth Amendment. However, the Michigan Constitution is different from the Eighth Amendment. Const 1963, art 1, § 16 bars "cruel *or* unusual punishments," and the textual difference between the Eighth Amendment and Const 1963, art 1, § 16 called for a broader interpretation of the Michigan prohibition than its federal counterpart. When determining whether a sentence is cruel or unusual, the trial court relies on a test set forth by the Michigan Supreme Court in *People v Bullock*, 440 Mich 15 (1992), which assesses: (1) the severity of the sentence imposed compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed on other offenders in the same jurisdiction, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the penological goal of rehabilitation. As applied to this case, regarding the first and second factors of the test, a parolable life sentence is the most severe penalty that can be imposed for second-degree murder, and it is particularly severe when imposed on a juvenile. The severity of the sentence was heightened by the fact that juveniles who committed second-degree murder could receive the same sentence as juveniles who committed first-degree murder with less process than the juveniles convicted of the more serious crime, because sentencing courts were not required to consider the mitigating qualities of youth before imposing sentence on a juvenile offender convicted of second-degree murder. Further, the Michigan Legislature, in enacting MCL 769.25 and MCL 769.25a, chose not to make parolable life the applicable sentence for juveniles who commit first-degree murder. Because this sentence was not on the table for the most serious crime a juvenile could commit, permitting it for a less serious offense was disproportionate and therefore cruel or unusual. Considering the third *Bullock* factor, the clear national trend was toward treating juveniles less harshly than adults and extending *Miller* beyond the context of mandatory life without the possibility of parole, with many states not allowing parolable life sentences for adult or juvenile offenders. Therefore, the third *Bullock* factor supported finding a parolable life sentence for a juvenile who committed second-degree murder to be cruel or unusual. Regarding the fourth *Bullock* factor, although a parolable life sentence may

advance the penological goal of rehabilitation in theory, the question for juvenile offenders was whether such a sentence provided a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. Parolable life sentences for juveniles do not advance the sentencing goal of rehabilitation because prisoners who have received this sentence are given lower priority for participation in educational and rehabilitative programming, which is especially necessary for juvenile offenders, and because a juvenile convicted of second-degree murder could receive a meaningful opportunity for release after a longer period of incarceration than the maximum sentence served by a juvenile convicted of first-degree murder. Finally, whether the Parole Board practically considered whether to grant parole to an offender serving a parolable life sentence was subject to changing executive branch policies. An offender's meaningful opportunity to gain release is to be measured in terms of the offender's demonstrated maturity and rehabilitation and should not be subject to the whims of executive branch policy. Under the test in *Bullock*, a parolable life sentence for a defendant who committed second-degree murder as a juvenile violated Const 1963, art 1, § 16.

Sentence for second-degree murder conviction vacated and case remanded to the Wayne Circuit Court for further proceedings.

Chief Justice MCCORMACK, concurring, wrote separately to address Justice ZAHRA's suggestion that the Supreme Court should revisit its caselaw interpreting Const 1963, art 1, § 16. The Supreme Court has long held that the textual difference between the federal and state constitutional provisions means that Article 1, § 16 provides slightly broader protection than the Eighth Amendment. Justice ZAHRA would hold that Article 1, § 16 only prohibited punishments that would have been considered cruel or unusual in 1963. In fact, it was likely that the original meaning of the prohibition in Article 1, § 16 was to consider standards of decency over time. Additionally, the United States Supreme Court had already implemented its "evolving standards of decency" approach to interpreting the Eighth Amendment when the state Constitution was ratified, so the fact that the ratifiers used the same words as the Eighth Amendment in Article 1, § 16 but with a more flexible conjunction indicated that they did not intend to reject the approach of the United States Supreme Court. Further, the assumption that, by trying to understand the text's original meaning, judges could set aside their own policy preferences was flawed. "Original" understandings of constitutional provisions were subject to differing interpretations, and allowing judges to reconsider long-settled precedent in order to consider the original meanings of constitutional provisions would render stare decisis irrelevant.

Justice ZAHRA, dissenting, joined by Justice VIVIANO (except as to footnote 9) and Justice CLEMENT (except as to footnotes 24 and 25), agreed with the majority that defendant's plea and sentencing agreements were not illusory or invalid and that defendant had entered into them knowingly, voluntarily, and intelligently. However, he disagreed that defendant's parolable life sentences constituted cruel or unusual punishment under Const 1963, art 1, § 16. In *Montgomery*, the Supreme Court explicitly approved of parolable life sentences for juvenile homicide offenders as a remedy for the mandatory life sentences held unconstitutional under *Miller*. *Miller* mandated only that the sentencing court consider an offender's youth and attendant characteristics before imposing life without the possibility of parole. Because defendant did not receive life without the possibility of parole, his Eighth Amendment challenge lacked merit. Justice ZAHRA further asserted that the Michigan Constitution did not support defendant's claim that his sentences were

constitutionally disproportionate pursuant to the test set forth by the Michigan Supreme Court in *People v Lorentzen*, 387 Mich 167 (1992), and *Bullock*. First, the severity of a parolable life sentence was proportionate to the gravity of a second-degree murder conviction. Second-degree murder was the second-most serious crime a person could commit under Michigan law, so it was logical that it was punishable by the second-most serious punishment, a parolable life sentence. With regard to the second factor, parolable life was not an uncommon sentence for serious crimes committed in Michigan, and Michigan law penalized some nonhomicide offenses with parolable life sentences, demonstrating that this punishment was not constitutionally disproportionate for homicides. Third, parolable life sentences were common in other states, and the majority opinion inappropriately relied on the law in jurisdictions that extended *Miller* to de facto life sentences, which was not what was at issue here. Fourth, defendant's sentences served the penological goal of rehabilitation because he was eligible for parole after 10 years and able to be reconsidered for parole every five years after that. Therefore, none of the factors in the *Lorentzen*/*Bullock* test supported the conclusion that a parolable life sentence was constitutionally disproportionate when imposed on a juvenile homicide offender, so defendant did not show that his sentence violated the Eighth Amendment or Const 1963, art 1, § 16. The majority opinion's application of the *Lorentzen*/*Bullock* factors was flawed in several respects. First, the majority conflated sentences of parolable life with nonparolable life sentences and rendered the distinction made between the two sentences by the *Montgomery* Court meaningless. Next, the majority improperly second-guessed the Legislature's policy decisions by using the Legislature's chosen *Miller* remedy, MCL 769.25 and MCL 769.25a, as a justification for finding parolable life sentences constitutionally disproportionate. Further, the facts of defendant's case demonstrate why his parolable life sentences are not more severe than the term-of-years sentences imposed under MCL 769.25 and MCL 769.25a. Finally, the majority based its contention that parolable life sentences for juvenile homicide offenders do not advance the penological goal of rehabilitation on its assertion that those sentenced to parolable life had less access to rehabilitative programming than those serving term-of-years sentences and on its assertion that the decision to grant parole is subject to the changing policies of the Parole Board. But the Parole Board was now required to consider the distinctive attributes of youth recognized in *Miller*, and the Board's policy directives required it to give prisoners who were denied parole a notice of decision setting forth the factors the Board considered and the corrective actions the prisoner could take to improve the probability of being granted parole in the future. Therefore, those sentenced to parolable life had the tools necessary to maximize their prospects for release. *Miller* applied only to life-without-parole sentences and required only a meaningful opportunity to obtain release. Because *Montgomery* concluded that parolable life sentences provided this meaningful opportunity, Justice ZAHRA would not have entertained defendant's request to redefine what constituted a meaningful opportunity. In this case and the other sentencing cases decided at the same time, the majority departed from the Court's past jurisprudence and improperly usurped the role of the Legislature.

Justice VIVIANO, dissenting, joined Justice ZAHRA's dissent except as to footnote 9. Justice VIVIANO disagreed with the majority and with Justice ZAHRA's statement in footnote 9 that defendant had satisfied the procedural requirements to file a successive motion for relief from judgment under MCR 6.502(G). The majority held that defendant's motion satisfied the procedural bar in MCR 6.502(G) because it was "based on a retroactive change in law." But defendant relied on *Miller* and *Montgomery*, both of which are inapplicable to defendants sentenced to life with the possibility of parole. Reliance on an inapplicable holding was not a true

basis or foundation to satisfy the court rule, and the majority's holding would allow defendants to satisfy the procedural requirements by citing a case with retroactive effect, regardless of whether the cited caselaw actually entitled them to any relief. The relief requested by defendant in his motion did not depend on recognition of the rule announced in *Miller* and made retroactive in *Montgomery*, and the majority's interpretation of MCR 6.502(G) would incentivize criminal defendants to file increasingly meritless successive motions for relief from judgment, which would further burden already backlogged trial courts. Additionally, even if defendant could overcome the procedural bar in the court rule, his constitutional argument would nevertheless fail for the reasons stated by Justice ZAHRA.

Justice CLEMENT, dissenting, joined Justice ZAHRA's dissent except as to footnotes 24 and 25 and except insofar as Justice ZAHRA's dissent conflicted with her opinion in *People v Boykin*, ___ Mich ___; ___ NW2d ___ (2022) (Docket Nos. 157738 and 158695) (CLEMENT, J., concurring in part and dissenting in part).

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 28, 2022

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                           No. 162425

MONTEZ STOVALL,

      Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

MᴄCᴏʀᴍᴀᴄᴋ, C.J.

We consider whether the defendant's life sentence with the possibility of parole for second-degree murder, imposed for a crime committed when he was a juvenile, violates Article 1, § 16 of the Michigan Constitution. That provision, unlike its federal counterpart, forbids cruel *or* unusual punishment, and our test from *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972), and *People v Bullock*, 440 Mich 15, 33-34; 485 NW2d 866 (1992), governs our review. Applying that test, we conclude that the defendant's sentence violates

the prohibition against cruel or unusual punishment in Const 1963, art 1, § 16, so we reverse the Court of Appeals, vacate the defendant's sentence, and remand to the Wayne Circuit Court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

In 1991, while he was a juvenile, the defendant fatally shot two men. He pled guilty in 1992 in two separate files to one count each of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, in exchange for the dismissal of first-degree murder charges. The plea deal also included a sentence agreement for life in prison with the possibility of parole (parolable life) for murder, consecutive to the mandatory two-year term for felony-firearm. In 1993, the defendant moved to withdraw his plea. The trial court denied that motion. The Court of Appeals affirmed, and this Court denied leave to appeal in 1994. Defendant subsequently filed multiple motions for relief from judgment, none of which succeeded.

The defendant filed this successive motion for relief from judgment in 2017, arguing that his plea was illusory and his sentences violate the Eighth Amendment of the United States Constitution under *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016), because he is effectively being denied a meaningful opportunity for release. The trial court denied the motion, concluding that despite the fact that the Parole Board is following stricter procedures than when the defendant entered into his plea, he still has a chance to be released, and his plea was not illusory. The Court of Appeals denied leave to appeal.

The defendant appealed here, and this Court remanded the case to the Court of Appeals as on leave granted. *People v Stovall*, 504 Mich 892 (2019). On remand, a majority of the Court of Appeals affirmed the decision of the trial court in a published opinion. *People v Stovall*, 334 Mich App 553; 965 NW2d 264 (2020). Judge GLEICHER dissented and would have remanded for a resentencing hearing consistent with *Miller* because she concluded that the defendant is serving a de facto sentence of life without the possibility of parole (LWOP) with no individualized consideration of the characteristics of youth. *Id*. at 572-580 (GLEICHER, P.J., dissenting).

The defendant again appealed here, repeating his same arguments. We granted leave to appeal and directed the parties to address

> (1) whether the defendant's parolable life sentences for second-degree murder were the result of an illusory plea bargain; (2) whether the defendant's sentences violate the prohibition against "cruel and unusual punishments" found in the Eighth Amendment to the United States Constitution, and/or the prohibition against "cruel or unusual punishment" found in Const 1963, art 1, § 16, where he was under the age of 18 at the time of the offenses; (3) whether the Parole Board's "life means life" policy renders the defendant's sentences unconstitutional under *Miller v Alabama*, 567 US 460 (2012), and *Montgomery v Louisiana*, 577 US 190 (2016); (4) whether, pursuant to *Miller* and *Montgomery*, the trial court was required to take the defendant's youth into consideration when accepting his plea and ruling on his motion for relief from judgment; and (5) whether the Parole Board is similarly required to take his youth into consideration when evaluating him for release on parole.

*People v Stovall*, 507 Mich 938 (2021). In light of our rulings below, we decline to address issues (3), (4), and (5) from our grant order.

3

## II. PROCEDURAL BAR IN MCR 6.502(G)

The prosecution argues that the defendant's successive motion for relief from judgment is barred by MCR 6.502(G) because the defendant's motion is not "based on a retroactive change in law." See MCR 6.502(G)(2). We disagree; as Justice CLEMENT said in her concurring statement in *People v Manning*, 506 Mich 1033, 1038 (2020) (CLEMENT, J., concurring), the retroactive change in law must only serve as a "foundation" or "base" for a defendant's claim to overcome the procedural bar in MCR 6.502(G)(2). Reading the rule more narrowly to require that the defendant's claims fall squarely within a retroactive change in law would effectively merge the procedural hurdle in MCR 6.502(G)(2) with the merits inquiry in MCR 6.508(D), rendering one of those provisions nugatory. *Manning*, 506 Mich at 1039 (CLEMENT, J., concurring), quoting *Apsey v Mem Hosp*, 477 Mich 120, 127; 730 NW2d 695 (2007) ("[N]o word should be treated as surplusage or made nugatory.").

Because *Miller* and *Montgomery* serve as the "foundation" or "base" for the defendant's challenges to the constitutionality of his sentences, his motion is "based on a retroactive change in law" and therefore overcomes the procedural bar in MCR 6.502(G).[1]

---

[1] The defendant also argues that his motion involves a "claim of new evidence that was not discovered before the first such motion [for relief from judgment]," satisfying the other exception to the procedural bar in MCR 6.502(G). See MCR 6.502(G)(2). Given our conclusion that the defendant's motion is "based on a retroactive change in law," we decline to address this argument.

4

## III. ANALYSIS

## A. ILLUSORY PLEA

The defendant first asserts that his plea was illusory because he believed that pleading guilty to second-degree murder was the only way to avoid spending his life in prison, but under *Miller* and *Montgomery*, mandatory LWOP was outside the power of the state to impose. "A defendant may be entitled to withdraw a guilty plea if the bargain on which the plea was based was illusory, meaning that the defendant received no benefit from the agreement." *People v Harris*, 224 Mich App 130, 132; 568 NW2d 149 (1997).

We disagree with the defendant that he received no benefit from his plea agreement. As the prosecution notes, the defendant could have still been sentenced to LWOP had he been convicted of first-degree murder; he just would have been entitled to a *Miller* hearing in 2016, after *Montgomery* was decided. So the defendant still received the benefit for which he bargained: the possibility of being paroled that a first-degree murder conviction might not have allowed. Thus, it is not the case that "the defendant received no benefit from the agreement." *Harris*, 224 Mich App at 132.[2]

---

[2] Defendant's citation of *People v Bollinger*, 224 Mich App 491, 493; 569 NW2d 646 (1997), is nominally on point but ultimately distinguishable. In *Bollinger*, the defendant pled guilty to avoid a habitual-offender enhancement that the state lacked any authority to enforce. *Id*. at 491-492. Thus, in both that case and this one, the defendant pled guilty to avoid a penalty that the prosecutor did not have the authority to pursue. But in *Bollinger*, the prosecutor agreed as part of the plea agreement to forgo prosecuting the defendant as a habitual offender, but it lacked any authority to do so because its habitual-offender notice was not timely filed. *Id*. at 492-493. Here, the prosecutor could have still sought a first-degree murder conviction and LWOP even if the defendant had been prosecuted after *Miller*; LWOP simply would not have been mandatory.

## B. CONSTITUTIONALITY OF PAROLABLE LIFE SENTENCE

Whether a defendant's sentence constitutes cruel and/or unusual punishment under the Eighth Amendment of the United States Constitution or Article 1, § 16 of the Michigan Constitution are questions of constitutional law that we review de novo. *People v Lockridge*, 498 Mich 358, 373; 870 NW2d 502 (2015). That means that we review them independently, with no required deference to the trial court. *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019).

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." US Const, Am VIII. In *Miller*, the United States Supreme Court held that mandatory LWOP sentences for juveniles violate the Eighth Amendment. Rather, a sentencer must have discretion to impose a lesser sentence on a juvenile after considering "the mitigating qualities of youth." *Miller*, 567 US at 476, quoting *Johnson v Texas*, 509 US 350, 367; 113 S Ct 2658; 125 L Ed 2d 290 (1993). The Court noted "three significant gaps between juveniles and adults": (1) Children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and risk-taking; (2) children are more vulnerable to negative influences and outside pressures from their family and peers, have limited control over their own environment, and lack the ability to extricate themselves from horrific, crime-producing settings; and (3) a child's traits are less fixed than those of an adult, and a child's actions thus are less likely to be evidence of irretrievable depravity. *Miller*, 567 US at 471.

In *Montgomery*, the Court held that *Miller* announced a substantive rule of constitutional law; therefore, it applied retroactively to cases on collateral review.

Defendant's challenge to his parolable life sentence under the Eighth Amendment fails—*Montgomery* tells us so explicitly. See *Montgomery*, 577 US at 212 ("A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them."). The United States Supreme Court wouldn't offer up a *Miller* remedy that it believed violated the Eighth Amendment. And if there were any doubt, *Jones v Mississippi*, 593 US ___; 141 S Ct 1307; 209 L Ed 2d 390 (2021) eliminated it. See *id*. at ___; 141 S Ct at 1314 (rejecting the argument that "*Miller* requires more than just a discretionary sentencing procedure"); *id*. at ___; 141 S Ct at 1321 ("*Miller* held that a State may not impose a mandatory life-without-parole sentence on a murderer under 18.").

The Michigan Constitution, however, is different. Article 1, § 16 of the Michigan Constitution provides that "[e]xcessive bail shall not be required; excessive fines shall not be imposed; cruel or unusual punishment shall not be inflicted; nor shall witnesses be unreasonably detained." The Michigan Constitution, therefore, forbids unusually excessive imprisonment. *Lorentzen*, 387 Mich at 172. In *Bullock*, 440 Mich at 30-35, this Court held that the textual difference between Michigan's prohibition on "cruel *or* unusual punishment" and the Eighth Amendment's bar on "cruel *and* unusual punishments," the historical circumstances when the Eighth Amendment was ratified, and longstanding Michigan precedent called for a broader interpretation of Michigan's prohibition against "cruel or unusual punishment" than the Supreme Court's interpretation of the federal counterpart.

The Court applied a four-part test adopted in *Lorentzen*, 387 Mich 167, for determining whether a sentence is cruel or unusual. *Bullock*, 440 Mich at 33-34. That test

7

assesses (1) the severity of the sentence imposed compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed on other offenders in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the penological goal of rehabilitation. *Bullock*, 440 Mich at 33-34, citing *Lorentzen*, 387 Mich at 176-181. That test also governs whether the defendant's parolable life sentence violates Const 1963, art 1, § 16.

As for the first and second *Bullock* factors (which go hand in hand here), a parolable life sentence is the most severe penalty that can be imposed for second-degree murder.[3]

_____

[3] A trial court could impose a long term-of-years sentence that would theoretically deprive a defendant of *any* chance of being paroled during their lifetime. But such a defendant, unlike a parolable lifer, would have an early release date and therefore be given higher priority for scarce rehabilitative and educational programming. See generally *In re Parole of Elias*, 294 Mich App 507, 530-531; 811 NW2d 541 (2011) (describing how a prisoner's participation in programming is considered in the parole guidelines); see also *People v Johnson*, unpublished per curiam opinion of the Court of Appeals, issued June 18, 2019 (Docket No. 344322), pp 8-9 ("[P]arolable lifers do not get the benefit of the parole guidelines until after an interview with a member of the parole board, after the sentencing judge or the judge's successor has had an opportunity to register any objections, and after a public hearing of the type contemplated for prisoners seeking pardon or commutation."). The defendant asserts, and the prosecution does not dispute, that his parole guidelines have never been scored.

Other considerations also make a term-of-years sentence less harsh than a life sentence. For example, a prisoner subject to a term-of-years sentence is generally considered for parole at no more than two-year intervals, but a parolable lifer is reviewed only at five-year intervals after serving 15 years of their sentence. Compare Michigan Department of Corrections, *Parole Process*, PD 06.05.104 (April 1, 2022), p 5, ¶ AA (providing for parole review "at intervals not to exceed 24 months" except in limited circumstances), available at <https://www.michigan.gov/documents/corrections/PD040122_06_05_104_750614_7.pdf> [https://perma.cc/T345-7QLN], with MCL 791.234(8)(b) (providing that a prisoner sentenced to imprisonment for life is reviewed for parole after serving 15 years of their

MCL 750.317. And it is particularly severe when imposed on a juvenile, given the important mitigating ways that children are different from adults. While second-degree murder is a grave offense, the law recognizes graver yet.

The severity of the sentence is also heightened by the fact that unlike courts sentencing juveniles who commit first-degree murder, sentencing courts who sentenced defendants like Mr. Stovall—those convicted of second-degree murder committed while they were juveniles—have not been required to consider the mitigating qualities of youth identified in *Miller* before imposing sentence. But see *People v Boykin*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 157738); slip op at 13 (courts sentencing juveniles who commit murder must consider the mitigating characteristics of youth when exercising their discretion to impose *any* sentence). In other words, while juveniles who commit first-degree murder will always receive a significant procedural safeguard before being sentenced to die in prison, see *People v Taylor*, ___ Mich ___; ___ NW2d ___ (2022) (Docket No. 154994); slip op at 8, defendants like Mr. Stovall who commit second-degree murder as juveniles are at risk to serve precisely the same sentence without that safeguard.[4]

---

sentence "and every 5 years thereafter"). We express no opinion on whether a long term-of-years sentence imposed on a juvenile would violate Const 1963, art 1, § 16.

[4] This failure is not mitigated by the Parole Board's recent adoption of provisions requiring the board to consider the mitigating characteristics of youth, i.e., the *Miller* factors, when considering a defendant for parole. See PD 06.05.104, p 3, ¶ N. While the Parole Board's consideration of these mitigating characteristics is certainly in harmony with recent advances in the way we understand how youth impacts behavior and culpability, *Miller* requires that *sentencing courts* consider the mitigating characteristics of youth before imposing a discretionary sentence on juveniles who would otherwise be subject to a mandatory LWOP sentence. Having the *Parole Board* consider those characteristics decades later in deciding whether to grant parole to the defendant is a doubly watered-

That is, they may receive the same sentence with less process although they have been convicted of a *less* serious offense.

As a practical matter, a parolable life sentence for second-degree murder is often *more* severe than the minimum sentences now given to most juveniles who commit *first-degree* murder: 25 to 40 years. In enacting MCL 769.25 and MCL 769.25a, the Legislature chose not to make a parolable life sentence the applicable sentence for juveniles who commit first-degree murder, even though the United States Supreme Court blessed parolable life as a constitutionally permissible means of accommodating its decision in *Miller*. See, e.g., *Miller*, 567 US at 489; *Montgomery*, 577 US at 212. When a sentence is not on the table for the most serious offense a juvenile can commit, see *People v Carp*, 496 Mich 440, 514; 852 NW2d 801 (2014) ("[F]irst-degree murder is almost certainly the gravest and most serious offense that an individual can commit under the laws of Michigan[.]"), cert gtd and opinion vacated sub nom on other grounds *Carp v Michigan*, 577 US 1186 (2016), permitting it for a less serious offense is disproportionate and therefore cruel or unusual.

Comparing the maximum penalty that the Legislature allows to be imposed against a juvenile convicted of first-degree murder to the maximum penalty it allows to be imposed against a juvenile convicted of second-degree murder is also instructive. See, e.g., *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003) (explaining that the Legislature roots both minimum and maximum sentences in the principle of proportionality). Without the safeguards of (1) the prosecution timely moving the trial

down version of what *Miller* requires and is no substitute for the judiciary's responsibility to ensure that sentences are constitutionally proportionate when they are imposed.

10

court to sentence a juvenile convicted of first-degree murder to LWOP; (2) the trial court conducting a hearing focused on the *Miller* factors; and (3) the trial court determining that the particular offender deserves LWOP, the maximum release date for a juvenile convicted of first-degree murder is typically 60 years. See MCL 769.25(4) or (9); MCL 769.25a(4)(c).

A hypothetical shows how this works. Consider Defendant A, who commits murder as a juvenile, is arrested on his seventeenth birthday, and is detained until he is ultimately convicted of *first-degree murder* and sentenced to a term-of-years sentence under MCL 769.25(4) or (9). Under the statute, which imposes a 60-year maximum for first-degree murder, on Defendant A's 77th birthday, he reaches his maximum discharge date and must be released from the Department of Corrections; the Parole Board has no discretion to keep Defendant A incarcerated even one more day.

Now consider Defendant B, who also commits murder as a juvenile, is arrested on his seventeenth birthday, is detained until he is instead convicted of *second-degree murder* and sentenced to parolable life, and who is not paroled during the first 60 years of his sentence. On Defendant B's 77th birthday, unlike Defendant A, there is no guarantee that he will be released from the custody of the Department of Corrections. The same is true the next year. And the next.

In short, in enacting MCL 769.25 and MCL 769.25a, the Legislature decided that the Parole Board has a limited window of authority for deciding when a juvenile convicted of the most serious crimes may be released. For many such offenders, the Parole Board's authority extends only to their sixtieth year of incarceration. That the Parole Board's

11

authority over juvenile offenders convicted of lesser offenses extends further into their term of incarceration is evidence of disproportionality.

Turning to the third *Bullock* factor, there is a clear national trend toward treating juveniles less harshly than adults and extending *Miller* beyond just the mandatory LWOP context. See, e.g., *McKinley v Butler*, 809 F3d 908, 911 (CA 7, 2016); *People v Franklin*, 63 Cal 4th 261, 276; 370 P3d 1053 (2016); *Casiano v Comm'r of Correction*, 317 Conn 52; 115 A3d 1031, 1045 (2015); *People v Buffer*, 2019 IL 122327, ¶¶ 25-27; 137 NE3d 763; *State v Null*, 836 NW2d 41, 71 (Iowa, 2013); *State v Zuber*, 227 NJ 422, 429; 152 A3d 197 (2017); *State v Kelliher*, ___ NC ___; ___ SE2d ___ (2022); *State v Moore*, 149 Ohio St 3d 557, 583; 2016-Ohio-8288; 76 NE3d 1127 (2016); *Davis v State*, 415 P3d 666; 2018 WY 40, ¶¶ 44-45 (2018) (all extending *Miller* to sentences that are de facto life sentences or the functional equivalent of LWOP); see also *State v Gilbert*, 193 Wash 2d 169, 175-176; 438 P3d 133 (2019) (sentencing courts must consider the mitigating characteristics of youth when sentencing all juveniles and may impose a lesser sentence on the basis of those characteristics, regardless of any sentencing statute to the contrary).

And many states authorize term-of-years sentences for second-degree murder and do not allow parolable life sentences—for *anyone*, not just juveniles.[5] See, e.g., Ariz Rev Stat Ann 13-710 (providing for a minimum of 10 years and a maximum of 29 years for second-degree murder); Ark Code Ann 5-10-103 (providing that second-degree murder is a Class A felony) and Ark Code Ann 5-4-401 (providing that the punishment for Class A

_____

[5] We agree with Justice ZAHRA's dissent that "parolable life is a common sentence for juvenile offenders in other states," but that's not very relevant. The *Lorentzen/Bullock* test compares the penalty imposed for the offense in Michigan and *the penalty imposed for the same offense* in other states.

12

felonies is a determinate sentence of 6 to 30 years); Ga Code Ann 16-5-1 (providing for a 10- to 30-year sentence for second-degree murder); Iowa Code 707.3 (providing for a 50-year maximum sentence for second-degree murder); Md Code, Crim Law 2-204 (providing for a 40-year maximum sentence for second-degree murder); Minn Stat 609.19 (same); New Mex Stat Ann 30-2-1 (providing that second-degree murder is a second-degree felony resulting in the death of a human being) and New Mex Stat Ann 31-18-15(4) (setting the punishment for second-degree felonies at 15 years in prison); Tenn Code Ann 39-13-210 (providing that second-degree murder is a Class A felony) and Tenn Code Ann 40-35-112 (providing that Class A felonies are subject to sentences of 15 to 60 years); Va Code 18.2-32 (providing for a minimum sentence of five years and a maximum sentence of 40 years for second-degree murder); W Va Code 61-2-3 (providing for a 10- to 40-year sentence for second-degree murder).

Of the states that do authorize parolable life for second-degree murder, some have recognized the difference between children and adults by making children sentenced to parolable life eligible for parole sooner. Compare, e.g., Ore Rev Stat 144.397(1)(a) and (2)(a) (allowing a prisoner who commits second-degree murder while a juvenile to be eligible for parole after 15 years) with Ore Rev Stat 163.115(5)(b) (providing that prisoners who commit second-degree murder must serve a minimum of 25 years in prison before becoming eligible for parole). For these reasons, the third *Bullock* factor supports finding a parolable life sentence for a juvenile who commits second-degree murder to be cruel or unusual.

Finally, although a parolable life sentence may advance the penological goal of rehabilitation in theory, for juvenile offenders the question is whether that parolable life

sentence provides a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Compare *Montgomery*, 577 US at 212, with *Miller*, 567 US at 479, quoting *Graham v Florida*, 560 US 48, 75; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

A lot of ground we have already covered leads us to conclude that a parolable life sentence for a juvenile offender convicted of second-degree murder does not advance this penological goal. First, prisoners who receive parolable life sentences are given lower priority when it comes to educational and rehabilitative programming. Access to these programs is vital, especially for juvenile offenders, to enhance their growth and rehabilitative potential. See *Graham*, 560 US at 74 (explaining that "[f]or juvenile offenders, who are most in need of and receptive to rehabilitation, the absence of rehabilitative opportunities or treatment makes the disproportionality of the sentence all the more evident") (citation omitted).

Second, the Legislature has made clear its intent that for juvenile first-degree-murder convictions, such a meaningful opportunity for release is generally available after 60 years unless the juvenile offender was afforded the procedural protection of a *Miller* hearing. It does not rationally follow that a meaningful opportunity for release for a juvenile convicted of second-degree murder could come after a longer period of incarceration than the maximum served by a juvenile convicted of first-degree murder.

Third, and relatedly, whether the Parole Board practically considers whether to grant parole to an offender serving a parolable life sentence is subject to the fluctuations of executive branch policies. An offender's meaningful opportunity to gain release is to be measured in terms of the offender's "demonstrated maturity and rehabilitation," not the whims of an executive branch policy directive instructing the Parole Board to forgo

14

consideration of all offenders serving parolable life. *Miller*, 567 US at 479 (quotation marks and citation omitted). Without further statutory limits, such as the one referred to by the Supreme Court in *Montgomery* as a permissible sentencing scheme, parolable life does not necessarily further the sentencing goal of rehabilitation. *Montgomery*, 577 US at 212, citing Wyo Stat Ann § 6-10-301(c) (noting that the Wyoming statute, which made juvenile homicide offenders eligible for parole after serving 25 years in prison, may be a constitutional sentencing scheme).

"[T]he people of Michigan, speaking through their constitution, have forbidden the imposition of cruel or unusual punishments, and we are duty-bound to devise a principled test by which to enforce that prohibition, and to apply that test to the cases that are brought before us." *Bullock*, 440 Mich at 41. We do that here and conclude that a parolable life sentence for a defendant who commits second-degree murder while a juvenile violates Article 1, § 16 of the Michigan Constitution. This conclusion is therefore precisely a determination of what the law requires and not, as the dissent asserts, an intrusion upon the Legislature's authority of determining what the law should be. We have done this without controversy many times before and will undoubtedly do so again. See, e.g., *Rafaeli, LLC v Oakland Co*, 505 Mich 429; 952 NW2d 434 (2020) (unanimously holding that the defendants had committed an unconstitutional taking by retaining the surplus proceeds from the tax-foreclosure sales of the plaintiffs' properties).

15

## IV. CONCLUSION

We vacate the defendant's sentence for second-degree murder because it violates Article 1, § 16 of the Michigan Constitution. We remand this case to the Wayne Circuit Court for further proceedings consistent with this opinion.

Bridget M. McCormack
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch

16

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                        No. 162425

MONTEZ STOVALL,

       Defendant-Appellant.

_____

McCORMACK, C.J. (*concurring*).

I concur in the majority opinion that I wrote.[1]  I write separately to address Justice ZAHRA's contention that our many prior decisions construing Article 1, § 16 of the Michigan Constitution, which precludes imposition of "cruel or unusual punishment," are analytically unsound and that he would therefore revisit them.  He finds them unsound because he does not believe the original meaning when ratified in 1963 included "evolving standards of decency."  Accepting Justice ZAHRA's premise for argument's sake that clear, unanimous original meaning is knowable, I'm not convinced that the original meaning of Article 1, § 16 doesn't include evolving standards of decency; more likely, that is exactly what the ratifiers intended.  But more importantly, his premise that clear, unanimous original intent can be discerned and applied by judges with superhuman neutrality to resolve legal questions in cases like this is flawed.

_____

[1] By quirk of this Court's practice, my colleagues and I can "concur" with an opinion for which we are the author, a step I have never taken before.  But here I appreciate the opportunity to dedicate a separate opinion to some fundamental observations.

To begin with our constitutional text. It contrasts with the corresponding provision in the Eighth Amendment of the United States Constitution, which prohibits "cruel *and* unusual punishment." This Court has long held that this textual difference means—not surprisingly given the plain meaning of conjunctions—that Article 1, § 16 provides slightly broader protection than the Eighth Amendment. See *People v Bullock*, 440 Mich 15, 30; 485 NW2d 866 (1992); *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972). In those same decisions, we have also followed the United States Supreme Court's analytical approach in applying the Eighth Amendment when applying Article 1, § 16. That is, we have agreed that the provision "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Lorentzen*, 387 Mich at 179, quoting *Trop v Dulles*, 356 US 86, 101; 78 S Ct 590; 2 L Ed 2d 630 (1958).

Justice ZAHRA, "[n]otwithstanding" this precedent, "question[s] whether the textual difference between the two punishment clauses is a sufficient basis to conclude that the Michigan Constitution provides greater protection than the Eighth Amendment." The basis for his question is, he asserts, that "[d]iffering interpretative principles apply to each constitutional provision." For that reason, Justice ZAHRA says that this Court was wrong to follow the United States Supreme Court's approach to interpreting the Eighth Amendment's prohibition against cruel and unusual punishment in light of the evolving standards of decency. Because his "interpretive principles," which are simply a factual contention, contrast with those of the United States Supreme Court, they make Michigan's constitutional protection less than, not more than, the Eighth Amendment's. Curious.

Justice ZAHRA therefore suggests that this Court has "gone astray" in this precedent (including precedent he himself joined, see *People v Carp*, 496 Mich 440; 852 NW2d 801

2

(2014)), because the ratifiers of the Michigan Constitution in 1963 might *not*—says he—have understood the prohibition against "cruel or unusual punishment" to consider society's evolving standards of decency. He thus would instead construe Article 1, § 16's prohibition against cruel or unusual punishment " 'to discern the original meaning attributed to the words of [the] constitutional provision by its ratifiers, the people, who are understood to have accepted the words employed in a constitutional provision in the sense most obvious to the common understanding and to have ratified the instrument in the belief that that was the sense designed to be conveyed.' "[2]  (Citation omitted.)  So far so good.[3] But then: "while the protection afforded under the Eighth Amendment is constantly evolving, the protection afforded under Const 1963, art 1, § 16, remains as it was originally understood at the time of ratification"; that is, he suggests that it prohibits only those punishments considered cruel or unusual in 1963.  This step is mere assertion.  Although the ratifiers of Const 1963, art 1, § 16 adopted language nearly identical to the Eighth

---

[2] When interpreting constitutional provisions, of course this Court has often referred to the rule of "common understanding" to consider how the operative terms were generally understood at the time of ratification.  See *Mich United Conservation Clubs v Secretary of State (After Remand)*, 464 Mich 359, 373-374; 630 NW2d 297 (2001) (YOUNG, J., concurring) (collecting cases).  But this has never been an exclusive tool; many of these same opinions make clear that courts may also consider "the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished" and the desire to avoid an interpretation that creates a constitutional invalidity.  See, e.g., *State Hwy Comm v Vanderkloot*, 392 Mich 159, 179; 220 NW2d 416 (1974), quoting *Traverse City Sch Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971).

[3] To emphasize, I agree with Justice ZAHRA that the ratifiers' intent is at the core of the issue.  The logical misstep in his argument is that it assumes the conclusion—that, in fact, the ratifiers intended to petrify then-existing conceptions of "cruel or unusual" punishment—and only those—for all time.  That contention requires support, which his argument does not provide.

Amendment, they meant, according to Justice ZAHRA, something far less. But what is the evidence for that?

Justice ZAHRA simply *supposes* that the 1963 ratifiers understood the prohibition against cruel or unusual punishment to mean punishments either cruel or unusual at the time. That argument rests on the premise that all ratifiers (or a majority, maybe?) agreed exactly about what the broad phrase "cruel or unusual punishment" meant in 1963 too. Given that assumption, all this Court needs to do is to look back to the precise and unanimous 1963 meaning of "cruel or unusual punishment" and, *voila*, then the modern applications will be clear.

But it does not follow that this Court's consideration of the "evolving standards of decency" when interpreting our state's constitutional prohibition on cruel or unusual punishment betrays "the original meaning attributed to the words of a constitutional provision by its ratifiers" as explained in recent decisions Justice ZAHRA cites. See *People v Vaughn*, 491 Mich 642, 651 n 25; 821 NW2d 288 (2012), and *People v Nutt*, 469 Mich 565, 573-574; 677 NW2d 1 (2004). More plausibly, the original meaning expressed by those words is precisely to consider standards of decency over time. The words on their face suggest as much. And given that the 1963 ratification came after the United States Supreme Court's "evolving standards of decency" approach to the Eighth Amendment was established, the ratifiers could have picked words to make very clear that they rejected the Supreme Court's evolving-understanding approach. Instead, they went with the same words, with a more flexible conjunction tying them together.

For, unlike certain terms with more fixed and less controversial meanings, see, e.g., *State Hwy Comm*, 392 Mich at 180 ("Certainly the popular and common understanding of

4

the word 'shall' is that it denotes mandatoriness."), the broad language "cruel or unusual punishment" itself conveys an understanding that this prohibition is to be applied in context and over time. It is far-fetched to suppose that the ratifiers of the 1963 Constitution themselves were unanimously committed to the belief that punishments cruel or unusual were understood (by them) to be fixed in time, static for all humanity. Nor is there evidence for this Court to assume as much. The ratifiers would have naturally expected the application of the broad words "cruel or unusual" to be applied to reflect evolving conceptions of cruelty, for example, over time.[4] There is no reason to assume otherwise.

So to get where he would go, Justice ZAHRA's argument must add text to our Constitution, like ". . . as we think today." That is, Justice ZAHRA, in effect, reads the constitutional text to prohibit something like "cruel or unusual punishment as we think of those today in 1963." The ghost modifier does all the work.

But enough on the merits question. I write here mainly to address Justice ZAHRA's claim about methodology because it feels important enough to warrant transparent discussion of the stakes.

Justice ZAHRA suggests that by tacking to original meaning (as a majority of us understand it), we can keep judges' subjective policy preferences out of decision-making. That is an alluring prospect: judges setting aside their policy preferences and instead

---

[4] Moreover, generations of Michiganders should not be prisoners of history with the breadth of their constitutional protections confined only to what the 1963 ratifiers would consider "cruel or unusual." That is not the nature of constitutionalism in the first place. Constitutions often express general principles to be applied in specific cases and context over time. Otherwise, constitutional law reduces to a two-dimensional exercise in history by us non-historian judges.

discerning the original meaning as understood by statesmen and stateswomen (usually statesmen) from generations past to guide interpretation. But this approach has three major flaws.

First, it assumes implausibly that there is such a thing as *an* original meaning and that it is identifiable. Second, the approach assumes, perhaps more heroically, that judicial efforts to discern "the" original meaning will not be impacted at all by judges' own experiences, perspectives, and values. Finally, Justice ZAHRA's approach eviscerates stare decisis, leaving judges even more room to channel their druthers.

To take each in turn.

Constitutional provisions usually lack a fixed, definitive original meaning apparent on the face of constitutional text that is sufficient to decide specific cases. As many have observed, history is complicated and contested, and neither judges nor their clerks are typically trained in the discipline. "Originalist source material is sometimes scarce and sometimes endless. It often does not specifically address the question that must be decided. When it does address that question, it often does so in many different voices, no one of which has a greater claim to authority than the others." Primus, *Limits of Interpretivism*, 32 Harv J L & Pub Pol'y 159, 170 (2009); see also Fallon, *The Many and Varied Roles of History in Constitutional Adjudication*, 90 Notre Dame L Rev 1753, 1758 (2015) ("[E]ither the original public meaning of constitutional language or the proper application of that meaning to particular cases frequently cannot be identified as a matter of simple historical fact."); Barrett, *Originalism & Stare Decisis*, 92 Notre Dame L Rev 1921, 1921 (2017) ("For an originalist, the meaning of the text is fixed *so long as it is discoverable*.") (emphasis added). Original understandings of constitutional provisions are therefore

subject to differing interpretations. *The Many and Varied Roles of History*, 90 Notre Dame L Rev at 1798 ("[H]istorical facts alone will frequently fail to prove the existence of an original intent, original understanding, or original public meaning that is sufficiently clear and determinate to resolve modern controversies."); Primus, *When Should Original Meanings Matter?*, 107 Mich L Rev 165, 214 (2008) ("[T]ellingly, many of the original meanings that operate as clear authority in constitutional law have actually achieved that clarity less because the underlying originalist source material was clear than because the United States Supreme Court issued a decision adopting a particular reading of that source material as authoritative.").

Not surprisingly, then, judges too routinely disagree about "the" most faithful original meaning of constitutional provisions. See, e.g., *New York State Rifle & Pistol Ass'n, Inc v Bruen*, 597 US ___; 142 S Ct 2111; ___ L Ed 2d ___ (2022); *id*. at ___ (Breyer, J., dissenting) (disagreeing with the majority opinion over the original meaning of the Second Amendment of the United States Constitution); *District of Columbia v Heller*, 554 US 570; 128 S Ct 2783; 171 L Ed 2d 637 (2008); *id*. at 636-680 (Stevens, J., dissenting) (same); *id*. at 681-723 (Breyer, J., dissenting) (same); *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642; 698 NW2d 350 (2005); *id*. at 672-684 (Cavanagh, J., dissenting) (disagreeing over the original meaning of "accrued financial benefits" in Article 9, § 24 of the Michigan Constitution).

Tacking to original meaning may make it just as likely that judges' policy preferences drive a result, intentionally or unintentionally, but either way less transparently. Indeed, as Professor Cary Franklin explained in her critique of the United States Supreme Court's decision in *Bostock v Clayton Co, Georgia*, 590 US ___; 140 S Ct

1731; 207 L Ed 2d 218 (2020), adherence to original meaning does not offer more objectivity than other methods of interpretation. It allows rather for disguised policy choices about how to interpret text, such as which bits of text to subject to textualist analysis; whether to consult a dictionary or a corpus linguistics database and, if so, which dictionary or database to use; and which definition to select—to name just a few. See Franklin, *Living Textualism*, 2020 Sup Ct Rev 119, 125 (2021) ("[O]riginal public meaning is a judicial construct. It is not something judges find, but something they produce—and something they need to produce because, in the kind of conflicts that reach the Court, there generally is not a single truth of the matter from a semantic standpoint."); see also *Limits of Interpretivism*, 32 Harv J L & Pub Pol'y at 170 ("[O]riginalism is a poor strategy for establishing clear rules of decision in advance of particular cases."); Choi, *Computational Corpus Linguistics* (July 1, 2022) (unpublished manuscript), p 1, available to download at <https://ssrn.com/abstract=4151849> (accessed July 20, 2022) [https://perma.cc/Z9US-VALM] ("[T]he traditional approach to corpus linguistics encounters several problems. It focuses on word frequencies at the expense of subtler linguistic cues and presents no clear dividing line between correct and incorrect textual meanings. It also requires a variety of subjective and opaque judgment calls, allowing motivated interpreters to cherry-pick the method that supports their favored meanings.").

Of course, judges should consult and consider all sources and dimensions of original meaning in analyzing constitutional text in applying constitutional provisions to specific cases. But I don't know any who don't. Often, however, a particular textual phrase—"cruel or unusual punishment," for example—doesn't allow us to resolve every application of that provision even if we *can* know what the ratifiers of the Constitution thought it meant

in 1963. In such cases, judges shouldn't pretend that we have some objective original meaning that requires a specific result.

But Justice ZAHRA isn't suggesting only that he would interpret Article 1, § 16 according to its original meaning (as he determines that original meaning), if called to do so, against a blank canvas. He would also overrule 50 years of this Court's precedent because, in his revisionist view, the Court's methodology was off. When the Court has for 50 years approached new iterations of a question governed by broad constitutional text with a specific analysis, it is immodest indeed to pitch that away because now, in 2022, one can determine somehow that the ouija board has spoken and the 1963 ratifiers meant something else by that broad language.

Such an approach renders stare decisis irrelevant. Yet stare decisis is an important commitment for courts because it allows people to order their affairs consistently with the law's requirements. We therefore normally require more than a majority of a court thinking that precedent was incorrectly decided. See *Robinson v Detroit*, 462 Mich 439, 463-468; 613 NW2d 307 (2000) (discussing the other factors to be considered before overruling a prior decision). After all, if we fully agreed with the way a previous case was decided we wouldn't need stare decisis—we'd just decide the next related question the same way. If stare decisis means anything, it means not every judicial decision is up for grabs from scratch. On the other hand, if original meaning provides a stare decisis override,[5] then it

---

[5] Even committed originalists have recognized that judges should not upset settled expectations, even when a precedent departs from the "original" meaning of a constitutional provision. See, e.g., Barrett & Nagle, *Congressional Originalism*, 19 U Pa J Const L 1, 1 (2016) ("Some decisions thought inconsistent with the Constitution's original public meaning are so well baked into government that reversing them would wreak havoc."). Justice Scalia emphasized that originalism should not be used to undo

9

provides a platform for judges to make policy choices while claiming they are doing something else.  (I set aside that constitutional ratifiers would be generally familiar with the doctrine of stare decisis and conferred constitutional judicial power in recognition of it.  In that sense, stare decisis has an originalist element itself.)

Justice ZAHRA would apparently still overturn our longstanding doctrine applying Article 1, § 16 if four members of this Court, lacking historical training, divine that the ratifiers in 1963 had a unanimous and specific understanding of a prohibition against "cruel or unusual punishment" that was not to be applied over time *and* that did not include a prohibition against parolable life sentences for young people.  Such new forms of judicial immodesty are likely to erode confidence in judicial neutrality.

Bridget M. McCormack

---

settled constitutional principles.  Scalia, *A Matter of Interpretation: Federal Courts & the Law* (Princeton: Princeton University Press, 1997), pp 138-139 ("Originalism, like any theory of interpretation put into practice in an ongoing system of law, must accommodate the doctrine of *stare decisis*; it cannot remake the world anew. . . . [O]riginalism will make a difference . . . not in the rolling back of accepted old principles of constitutional law but in the rejection of usurpatious new ones.").

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                            No. 162425

MONTEZ STOVALL,

        Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

In 1991, defendant murdered two people one month before he turned 18 years old. Defendant fatally shot his first victim because he believed the victim had shot an acquaintance of his. Three days later, defendant fatally shot his second victim because the victim's friend had attempted to rob defendant the day before. Defendant pleaded guilty to two counts of second-degree murder in exchange for the dismissal of one count of first-degree murder—a conviction for which, at the time, carried with it a sentence of mandatory life without parole—and an agreed-upon sentence of life with the possibility of parole (parolable life).[1] Defendant became eligible for parole after serving 10 years in prison.[2] After the Supreme Court of the United States held in *Miller v Alabama*[3] that mandatory

---

[1] Defendant also pleaded guilty to two counts of possession of a firearm during the commission of a felony (felony-firearm). The parolable life sentences were to be served consecutively to two concurrent terms of two years' imprisonment for the felony-firearm convictions. See MCL 750.227b(1).

[2] MCL 791.234(7)(a).

[3] *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

life without parole is unconstitutional for juvenile homicide offenders and held in *Montgomery v Louisiana*[4] that *Miller* applied retroactively, defendant filed this successive motion for relief from judgment seeking to withdraw his plea or, alternatively, have his parolable life sentences declared unconstitutional in light of *Miller* and *Montgomery*. The trial court denied defendant relief from the judgment, and the Court of Appeals affirmed. This Court granted defendant's application for leave to appeal on a number of issues regarding the validity of his plea and sentencing agreement and the constitutionality of his parolable life sentences.

I agree with the majority opinion that defendant's plea and sentencing agreement were not illusory or invalid, but instead were knowingly, voluntarily, and intelligently entered into by defendant. I disagree, however, with the majority opinion's conclusion that defendant's parolable life sentences constitute "cruel or unusual punishment" under Const 1963, art 1, § 16. Far from being constitutionally disproportionate, defendant's parolable life sentences match the severity of his two murder convictions while still affording him a meaningful opportunity to be reintegrated into society. For reasons more thoroughly developed in this opinion, I dissent from the majority opinion's conclusion that defendant's parolable life sentences are invalid and that he is entitled to relief from judgment under MCR 6.508(D).

---

[4] *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016).

2

## I. STANDARD OF REVIEW AND ENTITLEMENT TO RELIEF FROM JUDGMENT

A trial court's ruling on a motion for relief from judgment is reviewed for an abuse of discretion.[5] "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes."[6] "The proper interpretation and application of a court rule is a question of law that is reviewed de novo."[7] Questions of constitutional law are also reviewed de novo.[8]

To be entitled to relief from judgment under MCR 6.508(D),[9] defendant must show "good cause" for failing to raise the grounds for relief on appeal or in the prior motion and "actual prejudice" from the alleged irregularities that support the claim for relief.[10] MCR 6.508(D)(3)(b) states that actual prejudice, in relevant part, occurs when:

> (*ii*) in a conviction entered on a plea of guilty, . . . the defect in the proceedings was such that it renders the plea an involuntary one to a degree that it would be manifestly unjust to allow the conviction to stand;
>
> * * *
>
> (*iv*) in the case of a challenge to the sentence, the sentence is invalid.

---

[5] *People v Hewitt-El*, 501 Mich 1031 (2018).

[6] *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted).

[7] *People v Cole*, 491 Mich 325, 330; 817 NW2d 497 (2012).

[8] *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

[9] For the reasons stated in Justice CLEMENT's concurrence in *People v Manning*, 506 Mich 1033, 1036-1039 (2020), I agree with the majority opinion's conclusion that defendant's successive motion for relief from judgment is "based on a retroactive change in law that occurred after [defendant's] first motion for relief from judgment" and, therefore, satisfies the procedural bar in MCR 6.502(G)(2).

[10] MCR 6.508(D)(3)(a) and (b).

## II. RELEVANT LAW

The Eighth Amendment of the United States Constitution proscribes the imposition of "cruel and unusual punishments."[11] In *Miller*, the Supreme Court of the United States held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments."[12] The Supreme Court reasoned that juveniles' lack of maturity, vulnerability to negative influence, and transitory personality traits render them "constitutionally different from adults for purposes of sentencing."[13] These "distinctive attributes of youth diminish the penological justifications for imposing" life without parole on juvenile homicide offenders, and "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, [a sentencing scheme mandating life without parole for juvenile homicide offenders] poses too great a risk of disproportionate punishment."[14] Therefore, the Supreme Court in *Miller* held that before sentencing a juvenile homicide offender to life without parole, a sentencing court must first have an opportunity to consider the distinctive attributes of youth, i.e., the *Miller* factors.[15] The *Miller* Court clarified,

---

[11] US Const, Am VIII.

[12] *Miller*, 567 US 465 (quotation marks omitted).

[13] *Id*. at 471.

[14] *Id*. at 472, 479.

[15] Those factors include: (1) "[a defendant's] chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether "he might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with

4

however, that its holding "mandate[s] '*only* that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence"[16] and that " '[a] State is not required to guarantee eventual freedom,' but must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' "[17]

In *Montgomery*, the Supreme Court held that *Miller* applies retroactively to juvenile homicide offenders whose convictions and sentences were final when *Miller* was decided.[18] The Supreme Court assured that

> [g]iving *Miller* retroactive effect . . . does not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. *A State may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them.* Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment.[19]

In response to *Miller*, our Legislature enacted MCL 769.25 and MCL 769.25a, which provide relief to juvenile homicide offenders who committed certain crimes that,

---

youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation." *Id*. at 477-478.

[16] *Jones v Mississippi*, 593 US ___; 141 S Ct 1307, 1314; 209 L Ed 2d 390 (2021) (emphasis added), quoting *Miller*, 567 US at 483.

[17] *Miller*, 567 US at 479, quoting *Graham v Florida*, 560 US 48, 75; 130 S Ct 2011; 176 L Ed 2d 825 (2010) (holding that the Eighth Amendment bars life without parole for a juvenile convicted of a nonhomicide offense).

[18] *Montgomery*, 577 US 190.

[19] *Id*. at 212 (citation omitted; emphasis added).

before *Miller*, would have mandated life without parole.[20]  Under those statutes, if the prosecution seeks a life-without-parole sentence, the sentencing court is required to conduct a hearing to consider the *Miller* factors and specify on the record the aggravating and mitigating circumstances that the court considered in imposing its sentence.[21]  If the prosecution does not seek a life-without-parole sentence, the sentencing court must sentence the defendant to a term of years, in which the minimum sentence is between 25 and 40 years' imprisonment.[22]  Notably, MCL 769.25 and MCL 769.25a do not list second-degree murder as an eligible offense triggering either a *Miller* hearing or a term-of-years sentence.  Those statutes also do not address juvenile homicide offenders sentenced to parolable life.

Finally, the Michigan Constitution provides that "cruel *or* unusual punishment shall not be inflicted."[23]  "The textual difference between the federal constitutional protection and the state constitutional protection is of consequence and has led this Court to conclude that Article 1, § 16 provides greater protection against certain punishments than its federal counterpart . . . ."[24]  Our precedent provides that each punishment clause contains a

---

[20] MCL 769.25a was enacted in anticipation that *Miller* would apply retroactively.  It applies to juvenile homicide offenders who were sentenced to mandatory life without parole prior to *Miller* and provides essentially the same substantive relief as MCL 769.25.

[21] MCL 769.25(6), (7); MCL 769.25a(4)(b).

[22] MCL 769.25(9); MCL 769.25a(4)(c).

[23] Const 1963, art 1, § 16 (emphasis added).

[24] *People v Carp*, 496 Mich 440, 519; 852 NW2d 801 (2014), cert gtd and opinion vacated sub nom on other grounds *Carp v Michigan*, 577 US 1186 (2016).  Notwithstanding this statement in *Carp*, I question whether the textual difference between the two punishment clauses is a sufficient basis to conclude that the Michigan Constitution provides greater protection than the Eighth Amendment.  Differing interpretative principles apply to each

6

constitutional provision. The Supreme Court of the United States has stated that "[t]o determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." *Graham*, 560 US at 58 (quotation marks and citations omitted). In interpreting the Michigan Constitution, however, "[o]ur goal in construing our Constitution is to discern the original meaning attributed to the words of a constitutional provision by its ratifiers, the people, who are understood to have accepted the words employed in a constitutional provision in the sense most obvious to the common understanding and to have ratified the instrument in the belief that that was the sense designed to be conveyed." *People v Vaughn*, 491 Mich 642, 651 n 25; 821 NW2d 288 (2012) (quotation marks and citations omitted). Our task is to give effect to the meaning of the constitutional text that "the people who ratified the text *in 1963* gave to it," not "the meaning we as judges would prefer, or even the meaning the people of Michigan today would prefer[.]" *People v Nutt*, 469 Mich 565, 574 n 7; 677 NW2d 1 (2004) (quotation marks and citation omitted). In other words, while the protection afforded under the Eighth Amendment is constantly evolving, the protection afforded under Const 1963, art 1, § 16 remains as it was originally understood at the time of ratification.

It appears, however, that our caselaw concerning Const 1963, art 1, § 16 has gone astray by unthinkingly adopting the federal "evolving standards of decency" principle when it, in fact, conflicts with our general rule of constitutional interpretation. In *People v Lorentzen*, 387 Mich 167, 178-179; 194 NW2d 827 (1972), this Court appeared to incorporate the "evolving standards of decency" principle in deciding whether a sentence was constitutionally proportionate under both the United States and Michigan Constitutions, explaining that "[t]he decency test . . . looks to comparative law for guidelines in determining what penalties are widely regarded as proper for the offense in question." See *People v Coles*, 417 Mich 523, 530; 339 NW2d 440 (1983) (stating that, under *Lorentzen*'s analysis, "the definition of cruel or unusual punishment becomes a flexible one, changing with the evolving standards of decency as expressed by similar penal statutes"), overruled in part on other grounds by *People v Milbourn*, 435 Mich 630 (1990). This Court in *People v Bullock*, 440 Mich 15, 33-35; 485 NW2d 866 (1992), simply accepted *Lorentzen*'s proportionality analysis without first questioning whether its adoption of the "evolving standards of decency" principle conflicted with our traditional method of constitutional interpretation.

In sum, while this Court has stated that the textual difference between the Eighth Amendment and Const 1963, art 1, § 16 leads to greater protection under the latter, it did so without consideration of the materially different interpretative methods applicable to each provision. Given this, I question whether the above cases interpret Const 1963, art 1, § 16 correctly and whether the ratifiers of the Michigan Constitution in 1963 understood the "cruel or unusual punishment" clause to provide greater protection than what the Eighth Amendment currently provides under our society's evolving standards of decency.

7

Accordingly, I would revisit whether the textual difference between Const 1963, art 1, § 16 and the Eighth Amendment translates into a greater protection under the Michigan Constitution.

Rather than give any meaningful response to my criticisms regarding the precise legal question before this Court—i.e., the constitutional validity of a parolable life sentence for a juvenile homicide offender who specifically agreed to that sentence—Chief Justice McCormack responds to this footnote with a 10-page diatribe expressing, among other things, her opposition to original-meaning jurisprudence. Chief Justice McCormack claims my understanding of how we interpret the Michigan Constitution is "simply a factual contention." *Ante* at 2 (McCormack, C.J., concurring). Curious, considering this Court has consistently recognized that the Michigan Constitution is to be interpreted in accordance with " 'the text's original meaning [according] to the ratifiers, the people, at the time of ratification.' " *Rafaeli, LLC v Oakland Co*, 505 Mich 429, 456; 952 NW2d 434 (2020), quoting *Wayne Co v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004). See also *Woodland v Mich Citizens Lobby*, 423 Mich 188, 219; 378 NW2d 337 (1985) (" 'Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action. They [the courts] must construe them as the people did in their adoption, if the means of arriving at that construction are within their power.' ") (ellipsis omitted), quoting *People ex rel Bay City v State Treasurer*, 23 Mich 499, 506 (1871) (opinion of the Court by Cooley, J.); *Mich Farm Bureau v Secretary of State*, 379 Mich 387, 390-391; 151 NW2d 797 (1967) ("[T]he all important duty of the judiciary when constitutional provisions are brought up for interpretation and application . . . is to ascertain as best the Court may the general understanding and therefore the uppermost or dominant purpose of the people when they approved the provision or provisions thus brought up."); *Burdick v Secretary of State*, 373 Mich 578, 584; 130 NW2d 380 (1964) ("It is a fundamental principle of constitutional construction that we determine the intent of the framers of the Constitution and of the people adopting it. . . . [W]e should endeavor to place ourselves in the position of the framers of the Constitution, and ascertain what was meant at the time. . . . It could not mean one thing at the time of its adoption, and another thing today, when public sentiments have undergone a change. It is therefore essential that we determine the intent of [a constitutional] provision by reference to the state of the law or custom previously existing, and by the contemporaneous construction, rather than attempt to test its meaning by the so-called advanced or liberal views obtaining among a large class of the community at the present day.") (quotation marks and citations omitted).

Chief Justice McCormack now rejects our lodestar principle of constitutional interpretation, despite frequently subscribing to this standard as the appropriate method of constitutional interpretation in Michigan. See, e.g., *League of Women Voters of Mich v Secretary of State*, 508 Mich 520, 535; ___ NW2d ___ (2022) ("Our primary goal in construing a constitutional provision is to give effect to the intent of the people of the state

8

of Michigan who ratified the Constitution, by applying the rule of common understanding. We locate the common understanding of constitutional text by determining the plain meaning of the text as it was understood at the time of ratification.") (quotation marks and citation omitted); *Taxpayers for Mich Constitutional Gov't v Michigan*, 508 Mich 48, 60-61; 972 NW2d 738 (2021) (same); *Rafaeli*, 505 Mich at 456; (same); *Paquin v City of St Ignace*, 504 Mich 124, 129-130; 934 NW2d 650 (2019) (same); *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 61; 921 NW2d 247 (2018) (same); *Adair v Michigan*, 497 Mich 89, 101-102; 860 NW2d 93 (2014) (same). See also *In re House of Representatives Request for Advisory Opinion Regarding Constitutionality of 2018 PA 368 & 369*, 505 Mich 884, 886 (2019) (CLEMENT, J., concurring, joined by MCCORMACK, C.J.) ("When construing the Michigan Constitution, our primary goal is to give effect to the intent of the people of the state of Michigan who ratified the Constitution, by applying the rule of common understanding. Generally, we locate the common understanding of constitutional text by determining the plain meaning of the text as it was understood at the time of ratification . . . .") (cleaned up); *People v Cain*, 498 Mich 108, 132; 869 NW2d 829 (2015) (VIVIANO, J., dissenting, joined by MCCORMACK, C.J.) ("In interpreting the constitutional phrase 'trial by jury,' the guiding principle is to give the text the meaning it was understood to have at the time of its adoption by the people.") (quotation marks and citation omitted). My willingness to revisit our precedent interpreting Const 1963, art 1, § 16 is not, as the Chief Justice suggests, a frivolous request to overturn caselaw contrary to stare decisis. If anything, respecting stare decisis would demand adherence to our longstanding principle of constitutional interpretation discussed above, which dates back to at least 1871. Apparently, the Chief Justice is only concerned about stare decisis when it serves her interests.

Further, Chief Justice MCCORMACK embraces a cafeteria-style approach to constitutional interpretation, in which she picks any method that arguably supports her view. See *ante* at 3 n 2 (MCCORMACK, C.J., concurring). Chief Justice MCCORMACK's freewheeling approach to constitutional interpretation is simply not sound. The various interpretive tools used in the cases cited by the Chief Justice work toward a single purpose: to determine the original understanding of the ratifiers. Again, this Court has long held that our "primary objective" in interpreting a constitutional provision is to determine the text's original meaning according to the common understanding of the people at the time of ratification. *Rafaeli*, 505 Mich at 456 (quotation marks and citation omitted). And the Chief Justice concedes, as she must, that " 'the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished' " are helpful in accomplishing our objective. *Ante* at 3 n 2 (MCCORMACK, C.J., concurring), quoting *State Hwy Comm v Vanderkloot*, 392 Mich 159, 179; 220 NW2d 416 (1974). For example, we have repeatedly recognized that contemporary sources, such as the constitutional convention debates, the Address to the People, and dictionaries in circulation at the time of ratification may aid us in ascertaining how the constitutional text was commonly understood according to the people when they ratified it. See *People v Tanner*, 496 Mich

9

proportionality component making criminal sentences subject to appellate review.[25]  In

*People v Lorentzen* and *People v Bullock*, this Court set forth a four-prong test to assess

199, 224-226; 853 NW2d 653 (2014); *League of Women Voters*, 508 Mich at 537 n 7 (looking to dictionaries "more contemporaneous with the ratification of the [Michigan] Constitution" in interpreting Const 1963, art 2, § 9).

Chief Justice MCCORMACK also attributes to me many things not expressed or implied in this footnote.  For example, Chief Justice MCCORMACK asserts it is my position that "[a]lthough the ratifiers of Const 1963, art 1, § 16 adopted language nearly identical to the Eighth Amendment, they meant . . . something far less." *Ante* at 3-4 (MCCORMACK, C.J., concurring).  It is plainly obvious to any reasonable person that I make no such assertion in this footnote.  I simply question whether this Court was correct when it concluded without significant analysis that Article 1, § 16 provides *greater* protection than that provided under the Eighth Amendment.  This is not a novel concept.  Multiple commentators have observed that the phrases "cruel and unusual" and "cruel or unusual" were used interchangeably in early American history, with both formulations capturing the same meaning.  See, e.g., Stacy, *Cleaning Up the Eighth Amendment Mess*, 14 Wm & Mary Bill Rts J 475, 503-504 (2005); Bessler, *The Anomaly of Executions: The Cruel and Unusual Punishments Clause in the 21st Century*, 2 Brit J Am Legal Stud 297, 313 (2013); Casale & Katz, *Would Executing Death-Sentenced Prisoners After the Repeal of the Death Penalty Be Unusually Cruel Under the Eighth Amendment?*, 86 Conn B J 329, 336 (2012). And, as Justice RILEY noted in her partial dissenting opinion in *Bullock*, there is no evidence that "the replacement of the conjunctive 'and' by the disjunctive 'or' supports the argument that the drafters of the state constitution intended for this Court to interpret the phrase differently from the meaning that the United States Supreme Court has given the Eighth Amendment."  *Bullock*, 440 Mich at 58-61 (RILEY, J., concurring in part and dissenting in part).

Chief Justice MCCORMACK makes other claims that grossly mischaracterize my position.  Rather than rebut each of her assertions, I leave it to the reader to determine whether this footnote merits the uncharacteristic ad hominem attack expressed by the Chief Justice.

[25] See *Graham*, 560 US at 59 ("The concept of proportionality is central to the Eighth Amendment."); *Harmelin v Michigan*, 501 US 957, 997, 1001; 111 S Ct 2680; 115 L Ed 2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment) (concluding that "the Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle" that "forbids only extreme sentences that are 'grossly disproportionate' to the crime"), quoting *Solem v Helm*, 463 US 277, 288, 303; 103 S Ct 3001; 77 L Ed 2d 637 (1983).  See also *Bullock*, 440 Mich at 27-35 (holding that

whether a sentence is constitutionally proportionate.[26]    That test, which "bears a considerable resemblance to the federal test for proportionality,"[27] requires an assessment of (1) the severity of the sentence imposed compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed on other offenders in the same jurisdiction, (3) the penalty imposed for the offense in Michigan compared to the

---

Michigan's ban on cruel or unusual punishment includes a prohibition on grossly disproportionate sentences), citing *Lorentzen*, 387 Mich at 171-181.

However, I question the above caselaw, given the many jurists who have opined that neither the Eighth Amendment nor Const 1963, art 1, § 16 contain a proportionality component. See *Graham*, 560 US at 99 (Thomas, J., dissenting, joined by Scalia, J.) ("[T]he Cruel and Unusual Punishments Clause was originally understood as prohibiting torturous '*methods* of punishment,' "and "does not expressly refer to proportionality or invoke any synonym for that term[.]"), quoting *Harmelin*, 501 US at 965, 976 (opinion by Scalia, J., joined by Rehnquist, C.J.) (stating that the Cruel and Unusual Punishments "Clause disables the Legislature from authorizing particular forms or 'modes' of punishment—specifically, cruel methods of punishment that are not regularly or customarily employed" and does not contain a "proportionality guarantee").  See also *People v Correa*, 488 Mich 989, 990-992 (2010) (MARKMAN, J., concurring, joined by CORRIGAN and YOUNG, JJ.) (stating that Const 1963, art 1, § 16 does not contain a proportionality component; that the prohibition against cruel or unusual punishment only forbids certain modes or methods of punishment; and "that because 'imprisonment . . . is, and always has been, in this country and in all civilized countries, one of the methods of punishment,' it does not violate the Cruel or Unusual Punishment Clause") (brackets and emphasis omitted), quoting *People v Morris*, 80 Mich 634, 639; 45 NW 591 (1890); *Bullock*, 440 Mich at 48 (RILEY, J., concurring in part and dissenting in part) ("[T]he 'cruel or unusual punishment' clause was intended to prohibit inhumane and barbarous treatment of the criminally convicted, and does not have a proportionality component.").  Although I am bound to follow the interpretation of the Eighth Amendment espoused by the Supreme Court of the United States and "to enforce the rights conferred by" that Court, *People v Tanner*, 496 Mich 199, 219 n 10; 853 NW2d 653 (2014), I would revisit this Court's interpretation of Const 1963, art 1, § 16 as containing a proportionality component.  See *Manning*, 506 Mich at 1034-1035 (MARKMAN, J., concurring, joined by ZAHRA, J.).

[26] See *Bullock*, 440 Mich at 33-34; *Lorentzen*, 387 Mich at 176-181.

[27] *Carp*, 496 Mich at 520.

11

penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the penological goal of rehabilitation.[28]

## III.  ANALYSIS

## A.  ILLUSORY PLEA BARGAIN

Defendant first argues that *Miller* and *Montgomery* have rendered his plea illusory and invalid; that is, because mandatory life without parole for juvenile homicide offenders is now an unconstitutional sentence, defendant contends that his plea and sentencing agreement has no benefit and that he is therefore entitled to withdraw his plea.  I agree with the majority opinion that this argument lacks merit.  Defendant benefited from the plea and sentencing agreement at the time it was entered into by (1) avoiding a possible conviction of first-degree murder and a mandatory life-without-parole sentence attached to that conviction, and (2) becoming eligible for parole after serving 10 years' imprisonment. Even after *Miller* and *Montgomery*, defendant continues to benefit from the agreement by avoiding a life-without-parole sentence and remaining eligible for parole.  As the Supreme Court of the United States stated in *Brady v United States*:

> A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended . . . the likely penalties attached to alternative courses of action.  More particularly, absent misrepresentation or other impermissible conduct by state agents, a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.  A plea of

---

[28] *Bullock*, 440 Mich at 33-34.  See also *Solem*, 463 US at 292 ("[A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.").

guilty triggered by the expectations of a competently counseled defendant that the State will have a strong case against him is not subject to later attack because the defendant's lawyer correctly advised him with respect to the then existing law as to possible penalties but later pronouncements of the courts . . . hold that the maximum penalty for the crime in question was less than was reasonably assumed at the time the plea was entered.[29]

That defendant did not anticipate the Supreme Court of the United States would render mandatory life without parole an unconstitutional sentence for juvenile homicide offenders does not undermine the validity of his guilty plea, nor does it render his plea illusory or without any benefit. To be sure, "[s]ome element of pressure exists in every deal, as the tradeoff between present certainty and future uncertainty is emblematic of the process of plea bargaining."[30] After all, a plea agreement is a contract, and "[c]ontracts in general are a bet on the future."[31] But there is "no requirement in the Constitution that a defendant must be permitted to disown his solemn admissions in open court that he committed the act with which he is charged simply because it later develops . . . that the maximum penalty then assumed applicable has been held inapplicable in subsequent judicial decisions."[32] Accordingly, defendant has failed to show that he is entitled to relief

---

[29] *Brady v United States*, 397 US 742, 757; 90 S Ct 1463; 25 L Ed 2d 747 (1970) (citation omitted).

[30] *Dingle v Stevenson*, 840 F3d 171, 175 (CA 4, 2016); *Brady*, 397 US at 756-757 ("Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time.").

[31] *Dingle*, 840 F3d at 175.

[32] *Brady*, 397 US at 757.

13

under MCR 6.508(D) because there was no "defect in the proceedings . . . render[ing] the plea an involuntary one to a degree that it would be manifestly unjust to allow the conviction to stand,"[33] and his plea was not otherwise illusory entitling him to withdraw it.[34]

---

[33] MCR 6.508(D)(3)(b)(*ii*).

[34] Moreover, by entering into a valid plea and sentencing agreement, defendant arguably waived his ability to challenge the validity of his sentence under *Miller* and *Montgomery*. See *People v Likine*, 492 Mich 367, 409; 823 NW2d 50 (2012) ("An unconditional guilty plea that is knowing and intelligent waives claims of error on appeal, *even claims of constitutional dimension*.") (emphasis added). See also *People v Jones*, 2021 IL 126432, ¶ 21; ___ NE3d ___ (2021) ("Fundamentally, plea agreements are contracts, and principles of waiver apply equally to them."). Some courts faced with requests to extend the reasoning of *Miller* and *Montgomery* beyond life-without-parole sentences have held that a defendant's decision to enter into a plea and sentencing agreement waives any claim that a less-than-nonparolable-life sentence is unconstitutional under those decisions. See, e.g., *id.* at ¶ 26 (concluding that the juvenile homicide offender's "knowing and voluntary guilty plea [to a 50-year sentence] waived any constitutional challenge based on subsequent changes in the applicable law"); *Jones v Commonwealth*, 293 Va 29, 45; 795 SE2d 705 (2017) (holding that defendant's negotiated plea agreement "waived his right to challenge his sentence on direct appeal and, *a fortiori*, on collateral attack"; that his claim for relief under *Miller* and *Montgomery* was not "immunized from waiver principles that govern all other constitutional challenges"; and that "[n]othing in *Montgomery* undermines settled waiver principles"). See also *Carp*, 577 US at 1186 (Thomas, J., concurring, joined by Alito, J.) ("On remand [in light of *Montgomery*], courts should understand that the Court's disposition of these petitions does not reflect any view regarding petitioner's entitlement to relief. The Court's disposition does not, for example, address . . . *whether petitioners forfeited or waived any entitlement to relief* (*by, for example, entering into a plea agreement waiving any entitlement to relief*), or whether petitioners' sentences actually qualify as mandatory life without parole sentences.") (emphasis added). But see *Malvo v Mathena*, 893 F3d 265, 275-277 (CA 4, 2018) (declining to hold that the defendant waived his ability to challenge, on the basis of *Miller* and *Montgomery*, the constitutionality of his life-without-parole sentence imposed pursuant to an otherwise valid plea agreement), abrogated on other grounds by *Jones*, 593 US at ___; 141 S Ct at 1318-1319. Because defendant knowingly and voluntarily entered into his plea and sentencing agreement—a bargain that he continues to benefit from even after *Miller* and *Montgomery*—it is questionable whether this Court should further entertain his constitutional challenges to his

14

B.  CONSTITUTIONALITY OF DEFENDANT'S PAROLABLE LIFE SENTENCES

In the alternative, defendant argues that his parolable life sentences amount to cruel and/or unusual punishment under the United States and Michigan Constitutions.  I disagree.

There is no question that defendant's parolable life sentences are constitutionally proportionate under the Eighth Amendment.  The majority opinion correctly notes that *Montgomery* explicitly approved of parolable life sentences as a means for states to remedy *Miller* violations without having to "relitigate sentences."[35]  More compelling, however, is the Supreme Court's emphasis on the type of sentences to which *Miller* actually applies.  Again, "the *Miller* Court mandated *only* that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing *a life-without-parole sentence*."[36]  Given that defendant undisputedly did not receive a life-without-parole sentence, his Eighth Amendment challenge lacks merit.

Defendant's attempt to bring in the Michigan Constitution to do what the Eighth Amendment cannot must also fail.  Applying the four-factor test from *Lorentzen* and *Bullock*,[37] parolable life sentences for juvenile homicide offenders are not constitutionally disproportionate under Const 1963, art 1, § 16.

---

parolable life sentences.  Yet the majority opinion grants defendant relief without even considering this issue.

[35] *Montgomery*, 577 US at 212.

[36] *Jones*, 593 US at ___; 141 S Ct at 1316 (quotation marks and citation omitted; emphasis added).

[37] *Supra* at 10-12.

With regard to the first factor, this Court has explained that first-degree murder—which includes the "the premeditated taking of an innocent human life"—is the most serious offense under Michigan law and that the Legislature's imposition of life without parole for that offense, even for juveniles, is a proportionate punishment.[38]  Given that second-degree murder, also known as malice murder,[39] would be the second most serious offense that a person can commit under Michigan law, it is only natural that the second most serious punishment, i.e., parolable life, accompany a conviction of that offense. Logically then, the severity of a parolable life sentence is proportionate to the gravity of a second-degree murder conviction.[40]

With regard to the second factor, parolable life is not an uncommon sentence for serious crimes committed in Michigan—even for those crimes that do not involve the taking of an innocent person's life.  Some common, nonhomicide felonies subject to parolable life include assault with intent to murder, armed robbery, and first-degree

---

[38] *Carp*, 496 Mich at 514-515.

[39] "Malice" is an element of second-degree murder, *People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007), and is defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm," *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998).

[40] Defendant contends, and the majority opinion suggests, that parolable life for juveniles is the most serious punishment because sentencers are required to conduct a *Miller* hearing before imposing life without parole.  That an extra procedural step is necessary before imposing life without parole on a juvenile homicide offender does not alter the fact that a life-without-parole sentence is still a valid sentence and, therefore, remains "the law's harshest term of imprisonment" for juvenile offenders.  *Miller*, 567 US at 474.

criminal sexual conduct.[41]  That Michigan penalizes *nonhomicide* offenses with parolable life demonstrates that it is not a constitutionally disproportionate sentence for *homicide* offenses, some of which are committed by offenders who intended to kill their victims.

As to the third factor, parolable life is a common sentence for juvenile offenders in other states.[42]  The majority opinion's reliance on jurisdictions that extend *Miller*'s rationale to "de facto" life sentences is inapposite.  A "de facto" life sentence, also known as a "virtual" life sentence, is a sentence that "foreclose[s] the defendant's release from prison for all or virtually all of his expected remaining life span"[43] and often involves lengthy term-of-years sentences under which the defendant is not eligible for parole until he or she is geriatric.  Such sentences are necessarily distinct from a parolable life sentence in which the defendant becomes parole eligible much earlier in life.[44]  The de facto life-

---

[41]  MCL 750.83; MCL 750.529(2); MCL 750.520b(2)(a).  Other offenses subject to parolable life sentences include: first-degree arson, MCL 750.72(3); bank robbery, MCL 750.531; carjacking, MCL 750.529a(1); first-degree child abuse, MCL 750.136b(2); and kidnapping, MCL 750.349(3).

[42] See The Sentencing Project, *Youth Sentenced to Life Imprisonment* (October 2019), p 1 ("[A]ll states allow juveniles to be sentenced to life imprisonment, and all but two states have persons serving a life or 'virtual life' sentence for a crime committed as a juvenile."), available at <https://www.sentencingproject.org/publications/youth-sentenced-life-imprisonment/> (accessed May 19, 2022) [https://perma.cc/NC9E-XX4N].

[43] *Williams v United States*, 205 A3d 837, 844 (DC, 2019).  See also *State v Ramos*, 187 Wash 2d 420, 434; 387 P3d 650 (2017) (defining a "de facto life sentence" as one "result[ing] in a total prison term exceeding the average human life-span").

[44] See Restore Justice, *Know More: De Facto Life Sentences* <https://restorejustice.org/about-us/resources/know-more/know-more-de-facto-life-sentences> (accessed May 19, 2022) [https://perma.cc/SJ38-6KU5] ("De facto life sentences (also known as "virtual" life sentences) refer to *non-life sentences* that are so long the sentenced person will likely die or live out a significant majority of their lives before they are released.") (emphasis added).

sentencing cases are a far cry from the circumstances here, in which defendant's parolable

life sentence rendered him eligible for parole after serving just 10 years in prison. And,

even assuming defendant's parolable life sentences can be properly labeled "de facto" life

sentences, a number of courts have rejected the notion that *Miller* applies to de facto life

sentences for juvenile homicide offenders.[45] In short, Michigan is hardly an outlier in

imposing parolable life sentences for juvenile homicide offenders.

Finally, with respect to the fourth factor, defendant's sentences made him eligible

for parole after serving 10 years' imprisonment and allow him to be reconsidered for parole

every five years.[46] His sentences therefore serve the penological goal of rehabilitation.

They also serve "other critical penological goals, such as securing a just and proper

punishment as determined by a self-governing people and their representatives; the general

deterrence of other potential criminal offenders; and the individual deterrence, and

incapacitation, of the individual offender himself."[47]

Overall, *none* of the four *Lorentzen/Bullock* factors supports the conclusion that

parolable life is a constitutionally disproportionate sentence when imposed on a juvenile

homicide offender. Accordingly, defendant has not shown that his sentences are

unconstitutional under either the Eighth Amendment or Const 1963, art 1, § 16 and has not

carried his burden of proving that his sentences are invalid. Therefore, defendant has not

---

[45] See *State v Slocumb*, 426 SC 297, 313, 315 n 17, 315-323; 827 SE2d 148 (2019) (collecting cases illustrating an approximately even split of authority as to whether the Eighth Amendment, as interpreted by *Graham* and *Miller*, prohibits de facto life sentences for juvenile offenders convicted of nonhomicide and homicide offenses alike).

[46] MCL 791.234(7)(a) and (8)(b).

[47] *Manning*, 506 Mich at 1036 (MARKMAN, J., concurring).

18

established actual prejudice under MCR 6.508(D) and is not entitled to relief from judgment.

### IV. FLAWS IN THE MAJORITY OPINION'S LEGAL ANALYSIS

The majority opinion supports its application of the four *Lorentzen/Bullock* factors to defendant's parolable life sentences with several contentions with which I do not agree.

First, the majority opinion asserts that juvenile homicide offenders sentenced to life *with* the possibility of parole "are at risk to serve precisely the same sentence" as those offenders sentenced to life *without* the possibility of parole, and that the former group of offenders "may receive the same sentence with less process" than the latter group.[48] It is wholly unreasonable to suggest that a nonparolable life sentence is the same as a parolable life sentence. Such an assertion flies in the face of the *Montgomery* Court's guidance that states may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole and renders the distinction the Supreme Court made between parolable and nonparolable life sentences utterly meaningless. Further, the only "process" required by *Miller* is that sentencing courts be given the discretion to consider an offender's youth and to impose a sentence less than life without parole.[49] Here, defendant bargained for a parolable life sentence, and the sentencing court had the discretion to reject that sentence if it believed it was not tailored to defendant and his offenses.[50] Therefore, even

---

[48] *Ante* at 9.

[49] *Jones*, 593 US at ___; 141 S Ct at 1318 (explaining that *Miller* required "a discretionary sentencing procedure . . . where the sentencer can consider the defendant's youth and has discretion to impose a lesser sentence than life without parole").

[50] See *People v Killebrew*, 416 Mich 189, 206-207; 330 NW2d 834 (1982) ("If the sentence bargain includes a sentence agreement, whereby the defendant agrees with the prosecuting

though defendant is not entitled to relief under *Miller* and *Montgomery*, he received all the process that those decisions require.

Next, the majority opinion asserts that "a parolable life sentence for second-degree murder is often *more* severe than the minimum sentences now given to most juveniles who commit *first-degree* murder: 25 to 40 years," and purports to explain why the Legislature's chosen *Miller* remedy, MCL 769.25 and MCL 769.25a, renders defendant's parolable life sentences constitutionally disproportionate.[51]  The inference from the majority opinion's juxtaposition of parolable life sentences and term-of-years sentences under MCL 769.25 and MCL 769.25a is that, had the Legislature simply chosen to change all nonparolable life sentences for juvenile homicide offenders to parolable life sentences, such a scheme would be constitutionally permissible.  But, because the Legislature decided to retain life without parole as a permissible sentence for some Michigan juvenile homicide offenders and permit

---

attorney to plead guilty in exchange for a specific sentence disposition, the court must accept or reject the agreement or defer action until the judge has had the opportunity to consider the presentence report. . . .  If the judge feels that the agreed-upon disposition will serve the interests of justice, he may accept the agreement. . . .  However, if the judge, in the exercise of his discretion, finds that the bargain is not tailored to reflect the particular circumstances of the case or the particular offender, he shall reject the plea at that time.").  See also *Jones*, 2021 IL 126432, ¶ 27-28 (holding that the sentencing court's authority to accept or reject the defendant's plea and sentencing agreement "necessarily constituted an exercise of its discretion," thereby satisfying the constitutional requirements of *Miller*).

[51] *Ante* at 10.  The majority also asserts a general rule that "the Parole Board's authority extends only to the[] sixtieth year of incarceration" for juvenile homicide offenders sentenced and resentenced under MCL 769.25 and MCL 769.25a.  *Ante* at 11.  This is not necessarily accurate.  Juvenile homicide offenders ordered to serve term-of-years sentences post-*Miller* receive a maximum sentence that "shall be not less than 60 years," MCL 769.25(9), while offenders benefiting from *Montgomery* receive a maximum sentence that "shall be 60 years," MCL 769.25a(4)(c).  Thus, a defendant sentenced under MCL 769.25(9) may be subject to a lengthier maximum sentence than a defendant resentenced under MCL 769.25a(4)(c).

term-of-years sentences for others, the majority opinion concludes that parolable life sentences are unconstitutional for *all* juvenile homicide offenders. Put another way, the majority opinion concludes that parolable life for juvenile homicide offenders is unconstitutional because the Legislature excludes parolable lifers like defendant from its chosen *Miller* remedy—even though those offenders do not fall within the purview of *Miller*. This is truly a remarkable conclusion, as the majority opinion uses the Legislature's chosen *Miller* remedy as a justification for finding parolable life sentences constitutionally disproportionate. This is nothing short of second-guessing the Legislature's policy decisions, which we may not do.[52]

In any event, the facts of defendant's case demonstrate why his parolable life sentences are not more severe than the term-of-years sentences imposed under MCL 769.25 and MCL 769.25a. Defendant's agreed-upon sentences of parolable life allowed him to become eligible for parole after serving just 10 years in prison, and he remains parole eligible to this day. On the other hand, if defendant were entitled to the same relief as those offenders resentenced under MCL 769.25a, the sentencing court could impose the maximum term-of-years sentence of 40 to 60 years, meaning defendant would no longer be eligible for parole. In fact, the roughly 29 years of imprisonment that defendant has served up to this point is at the lower end of the 25- to 40-year allowable minimum sentence. And, given that defendant committed *multiple* murders one month shy of turning 18 years old, it is very possible, if not likely, that he would receive the maximum 40-year

---

[52] *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 759; 641 NW2d 567 (2002) ("[O]ur judicial role precludes imposing different policy choices than those selected by the Legislature[.]") (quotation marks and citation omitted).

minimum sentence were he eligible for resentencing under that scheme. In short, it is far from clear that defendant's parolable life sentences are more severe—let alone constitutionally disproportionate—than the term-of-years sentences imposed under MCL 769.25 and MCL 769.25a, particularly since defendant himself bargained for his parolable life sentences in the first place.[53]

Finally, the majority opinion contends that parolable life for juvenile homicide offenders does not advance the penological goal of rehabilitation because parolable lifers have less access to rehabilitative programming than offenders serving a term-of-years sentence and because the decision to grant parole is subject to the varying policies of the Parole Board. That is, the majority opinion faults the Department of Corrections and the Parole Board for making it difficult for parolable lifers like defendant to obtain release. A motion for relief from judgment challenging the constitutionality of an otherwise valid sentence is hardly the appropriate vehicle to launch an attack on the policies and procedures of the executive branch.[54] But in any event, statistics provided by the prosecution and the

_____

[53] Defendant speculates that he would have benefited from going to trial as charged, losing, and being sentenced to mandatory life without parole so that he could receive relief under *Miller*, *Montgomery*, and MCL 769.25a. Not only does defendant's hindsight ignore the teachings of *Brady*, see *supra* at 12-13, he also fails to appreciate that life without parole is still a valid sentence for juvenile homicide offenders under Michigan law. See *Carp*, 496 Mich at 528 (holding that neither the Eighth Amendment nor Const 1963, art 1, § 16 categorically barred the imposition of life without parole on juvenile homicide offenders). Thus, while it is possible that defendant could have received a term-of-years sentence had he been convicted of first-degree murder and obtained relief under *Miller* and *Montgomery*, it is also possible that he could have received the greater—and still constitutionally permissible—sentence of life without parole.

[54] See *People v Johnson*, unpublished per curiam opinion of the Court of Appeals, issued June 18, 2019 (Docket No. 344322), p 9 ("The essence of defendant's sentence challenge . . . is that the policies and procedures of the parole board are unconstitutional based on an application of *Miller* and *Graham* . . . because they deprive defendant of any

22

Attorney General demonstrate that parolable lifers have been paroled at a reasonable rate in the decade since *Miller* and *Montgomery* were decided; in fact, the rate for juvenile parolable lifers alone from 2016 to 2021 (20.6%) is even higher than the average rate of parole for the general prison population during that same time period (16.67%).[55] Further, the Michigan Department of Corrections recently amended its policy directives to now require the Parole Board to consider the distinctive attributes of youth recognized in *Miller*.[56] Although the Parole Board, after considering those mitigating factors, may nonetheless decide not to grant a juvenile parolable lifer an interview, the policy directives require the Board to give the prisoner "a Parole Board Notice of Decision . . . that shall set forth the factors considered for that decision and what corrective action the prisoner may take to improve the probability of being granted a parole in the future."[57] Parolable lifers therefore have the tools necessary to maximize their prospects for release.

Of course, as noted in the majority opinion, there is no "guarantee" that defendant will be released.[58] Michigan law simply does not require that someone sentenced to a

---

real possibility of parole . . . . However, invalidating defendant's valid sentence and resentencing him to a term[]of years is not the answer. The appropriate vehicle in which to seek redress of the alleged wrong done by the parole board is a claim for relief under 42 USC 1983 filed against the parole board."), citing *Wershe v Combs*, 763 F3d 500 (CA 6, 2014).

[55] These statistics rebut defendant's argument that the Parole Board currently employs a "life means life" policy.

[56] Michigan Department of Corrections, *Parole Process*, PD 06.05.104 (April 1, 2022), p 3, ¶ N, available at <https://perma.cc/T345-7QLN>.

[57] *Id.*, ¶ O.

[58] *Ante* at 11.

parolable life sentence actually receive parole. Whether parole is awarded is left to the sound discretion of the Parole Board. *Miller* demands nothing more. Aside from applying only to life-without-parole sentences, *Miller* requires only a "meaningful *opportunity* to obtain release based on demonstrated maturity and rehabilitation."[59] Nowhere did the Supreme Court in *Miller* or *Montgomery* state that juvenile homicide offenders are guaranteed release. Defendant had a genuine opportunity for parole when he was sentenced, and he still has that opportunity today. That he has not yet been granted parole does not mean he is deprived of a meaningful opportunity for release. Unlike the majority opinion, I would not entertain defendant's request to redefine what constitutes "a meaningful opportunity to obtain release."[60] *Montgomery* already provided an answer to that question—parolable life, which is precisely the sentence that defendant bargained for in exchange for pleading guilty to committing multiple murders.

## V. SUMMARY AND RAMIFICATIONS OF THE MAJORITY'S CHANGES TO THIS STATE'S SENTENCING JURISPRUDENCE

Today, in this case and in four other juvenile sentencing cases, a majority of this Court makes law and adopts rules that are only tenuously related to the caselaw being cited in support of this action. These decisions are a radical departure from our criminal-sentencing jurisprudence. At the heart of all of these decisions is *Miller*'s holding that "mandatory life without parole for those under the age of 18 at the time of their crimes

---

[59] *Miller*, 567 US at 479 (quotation marks and citation omitted; emphasis added); *Montgomery*, 577 US at 212 ("The *opportunity for release* will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change.") (emphasis added).

[60] *Miller*, 567 US at 479 (quotation marks and citation omitted).

violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' "[61] A majority of this Court repeatedly uses the rationale of *Miller* to decide issues far beyond those related to mandatory life without parole for juvenile homicide offenders. It is important to briefly lay out the breadth of the majority's holdings in all of these cases and the flaws in its analyses.

Less than two years ago, this Court declined to extend *Miller*'s reasoning to 18-year-old homicide offenders sentenced to mandatory life without parole.[62] The law has not materially changed in the intervening two years, but this Court's composition has. In *People v Parks*, a bare majority of this newly comprised Court does an about-face and now uses the Michigan Constitution to apply *Miller* to such defendants who challenge their mandatory life-without-parole sentences on direct appeal.[63] The result is that mandatory life without parole is now unconstitutional for 18-year-old homicide offenders in the state of Michigan. Rather than being based in a sound interpretation of our Constitution, much of the majority's rationale is based on policy considerations that are properly within the purview of the Legislature, not this Court.[64] It is likely only a matter of time before the majority again flexes its judicial policymaking power to extend *Miller* further,[65] perhaps doing away with mandatory life without parole altogether.

---

[61] *Id*. at 465 (quotation marks omitted).

[62] See *Manning*, 506 Mich 1033.

[63] *People v Parks*, ___ Mich ___; ___ NW2d ___ (2022) (Docket No. 162086).

[64] See *id*. at ___; slip op at 14-21 (CLEMENT, J., dissenting, joined by ZAHRA and VIVIANO, JJ.).

[65] See *id*. at ___; slip op at 19-20 (CLEMENT, J., dissenting).

In *People v Poole*, a bare majority of this Court has set the stage for applying *Parks* retroactively, such that defendants who were 18 years old when they committed murder and were later sentenced to mandatory life without parole may challenge their sentences through motions for relief from judgment.[66] If the Court of Appeals accepts the majority's invitation to extend *Parks* in this way, trial courts will be faced with a slew of resentencings. This will exhaust precious judicial resources in an untold number of cases and will not only open up old wounds for the families of victims, but will also subject them to a whole new trauma—the prospect that their loved-ones' killers will be released from incarceration.

In the present case, the majority, again reading into our state Constitution, makes the astounding proclamation that our trial courts no longer have any discretion to sentence a juvenile convicted of second-degree murder to life *with the possibility of parole*. By striking down parolable life as a constitutional sentence for juvenile homicide offenders, the majority substitutes what the law actually requires with what the majority believes it should require, impermissibly usurping the Legislature's role in making the policy decisions of this state. And, given the majority's expansion of *Miller* to 18-year-olds in *Parks*, it may only be a matter of time before the majority further expands the class of defendants who may not be sentenced to parolable life.

In *People v Taylor*, a bare majority of this Court conjures a presumption against life without parole for juveniles convicted of first-degree murder and imposes a burden on the

---

[66] *People v Poole*, ___ Mich ___ (2022) (Docket No. 161529).

prosecution to rebut this presumption by clear and convincing evidence.[67]  This brazen

rewrite of the statute, enacted by the Legislature post-*Miller* to govern the procedures for

sentencing juvenile homicide offenders, will drastically limit the discretion sentencing

courts have traditionally held to impose a sentence on a defendant convicted of committing

one of our state's most serious crimes.[68]

Finally, in *People v Boykin*, the majority requires trial courts to consider the

mitigating qualities of youth when sentencing a defendant to a term of years under MCL

769.25 or MCL 769.25a, despite no constitutional, statutory, or precedential basis to do

so.[69]  By creating this new rule, the majority invades the role of the Legislature, ignoring

the policy choices it made in enacting MCL 769.25 and MCL 769.25a.[70]

Each of these cases, standing alone, represents a significant departure from our

jurisprudence in this area of the law.  But taken as a whole, a bare majority of this Court

(in all of the cases but *Boykin*) has dramatically rewritten the sentencing laws applicable to

young people who commit society's most heinous crimes.  Defining crime and fixing

punishment is emphatically a legislative task,[71] in that it presents profound questions of

policy and moral judgment best left for the Legislature to establish, not for a slim majority

---

[67] *People v Taylor*, ___ Mich ___; ___ NW2d ___ (2022) (Docket No. 154994).

[68] See *id*. at ___; slip op at 1 (VIVIANO, J., dissenting, joined by ZAHRA and CLEMENT, JJ.).

[69] *People v Boykin*, ___ Mich ___; ___ NW2d ___ (2022) (Docket Nos. 157738 and 158695).

[70] See *id*. at ___; slip op at 2 (ZAHRA, J., dissenting, joined by VIVIANO, J.).

[71] See *United States v Wiltberger*, 18 US (5 Wheat) 76, 95; 5 L Ed 37 (1820) ("[T]he power of punishment is vested in the legislative, not in the judicial department.  It is the legislature, not the Court, which is to define a crime, and ordain its punishment.").

of this Court to prescribe by judicial fiat.[72] As Michigan's court of last resort, it is critically important that we honor and respect the separation of constitutional powers and limit the exercise of our judicial power to simply state what the law requires and not discern what the law *should* be in light of competing policy considerations. That is a duty constitutionally reserved for the Legislature: the state's elected government body representing the will of the people. This Court undoubtedly has the final word on the constitutionality of a particular sentence, but by failing to check its judicial power and simply state what the law is, the majority denies the Legislature and the people who elect our legislative representatives their rightful constitutional authority to determine the punishment for a particular crime.

## VI. CONCLUSION

Although defendant is ineligible for the constitutional relief articulated in *Miller* and *Montgomery* and falls outside the purview of the Michigan Legislature's chosen *Miller* remedy, the Court has inappropriately used its judicial power to fashion a remedy for defendant that, before today, never existed in Michigan law. Put simply, the majority opinion's erroneous application of the *Lorentzen*/*Bullock* factors leads it to the flawed conclusion that parolable life sentences are categorically disproportionate for juvenile

---

[72] See *Gregg v Georgia*, 428 US 153, 175; 96 S Ct 2909; 49 L Ed 2d 859 (1976) (opinion by Stewart, J.) ("In a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.") (brackets, quotation marks, and citation omitted); *Harmelin*, 501 US at 962 (opinion by Scalia, J.) ("[T]he length of the sentence actually imposed is purely a matter of legislative prerogative.") (quotation marks and citation omitted); *id*. at 998 (Kennedy, J., concurring in part and concurring in the judgment) ("[T]he fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not courts.") (quotation marks and citation omitted).

28

homicide offenders under Const 1963, art 1, § 16.  The law does not require this result, and the majority's mistaken belief that it does invades the province of the Legislature by displacing its quintessential role of fixing punishment.[73]   Because the majority opinion affords defendant relief from an otherwise constitutionally proportionate sentence, I dissent.

Brian K. Zahra
David F. Viviano (except as to
footnote 9)
Elizabeth T. Clement (except as to
footnotes 24 and 25)

---

[73] See *State v Soto-Fong*, 250 Ariz 1, 10; 474 P3d 34 (2020) ("[C]ourts that have held de facto juvenile life sentences unconstitutional provide a cautionary tale, as they have invariably usurped the legislative prerogative to devise a novel sentencing scheme . . . .").

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                          No. 162425

MONTEZ STOVALL,

      Defendant-Appellant.

_____

VIVIANO, J. (*dissenting*).

To reach the merits of the constitutional issue raised by defendant concerning cruel or unusual punishment, the majority first holds that defendant has satisfied the procedural requirements to file a successive motion for relief from judgment. I disagree with that conclusion. I do not believe defendant has overcome the procedural bar to filing a successive motion for relief from judgment and write to explain why I believe it is unnecessary to even reach the merits of defendant's motion.

Defendant, who pleaded guilty to two counts of second-degree murder, had previously filed motions for relief from judgment prior to filing the motion at issue in this case. Therefore, he must satisfy the procedural requirements of MCR 6.502(G), which bars successive motions for relief from judgment unless certain exceptions apply. At the time defendant filed his motion for relief from judgment, MCR 6.502(G) stated:

> (1) Except as provided in subrule (G)(2), regardless of whether a defendant has previously filed a motion for relief from judgment, after August 1, 1995, one and only one motion for relief from judgment may be filed with regard to a conviction. The court shall return without filing any

successive motions for relief from judgment. A defendant may not appeal the denial or rejection of a successive motion.

(2) A defendant may file a second or subsequent motion based on a retroactive change in law that occurred after the first motion for relief from judgment or a claim of new evidence that was not discovered before the first such motion. The clerk shall refer a successive motion that asserts that one of these exceptions is applicable to the judge to whom the case is assigned for a determination whether the motion is within one of the exceptions.[1]

In his current motion for relief from judgment, defendant argued, *inter alia*, that his sentences violate the Eighth Amendment pursuant to *Miller v Alabama*, 567 US 460, 465; 132 S Ct 2455; 183 L Ed 2d 407 (2012) (holding that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments' "), and *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016) (applying *Miller* retroactively). He claimed these decisions were retroactive changes in law that allowed him to file a successive motion for relief from judgment. The trial court denied his motion, acknowledging that *Montgomery* held that *Miller* applies retroactively but explaining that *Miller* is not applicable to cases involving juveniles sentenced to life with the possibility of parole. Because *Miller* and *Montgomery* were inapplicable to defendant, the trial court declined to review his claims under the principles announced in those cases. Without expressly stating that the trial court erred in its analysis of MCR 6.502(G)(2), the Court of Appeals indicated that defendant's reliance on *Miller* and *Montgomery* "tenuously" satisfied the procedural requirement to allow him to file a successive motion for relief from judgment. *People v*

---

[1] MCR 6.502, as amended June 2, 1995, 449 Mich xciii (1995). This provision of the court rule has since been amended twice. Neither of these amendments are relevant for purposes of this appeal.

2

*Stovall*, 334 Mich App 553, 561; 965 NW2d 264 (2020). It proceeded to address the merits of his motion, concluding that the trial court did not abuse its discretion in denying defendant's motion.

The majority in this Court holds that defendant's motion was "based on a retroactive change in law," such that it satisfied MCR 6.502(G)'s procedural bar. The majority adopts the reasoning of Justice CLEMENT's concurring statement in *People v Manning*, 506 Mich 1033, 1038 (2020) (CLEMENT, J., concurring), holding that the change in law need only serve as a "foundation" or "base" for the defendant's claim. Justice CLEMENT's concurrence noted that *Merriam-Webster's Collegiate Dictionary* (11th ed) defines the verb "base" as: "1: to make, form, or serve as a base for 2: to find a base or basis for— usu[ally] used with *on* or *upon*" and that *Black's Law Dictionary* (11th ed) similarly defines "base," in relevant part, as "[t]o make, form, or serve as a foundation for . . . ." *Manning*, 506 Mich at 1038 (CLEMENT, J., concurring).

I do not disagree with the definition of "base" that the majority applies today and that Justice CLEMENT applied in *Manning*. Rather, I disagree with how the majority applies that definition to defendant's motion for relief from judgment. Reliance on a clearly inapplicable holding—such as the holdings of *Miller* and *Montgomery* to a defendant sentenced to life with the possibility of parole—is not a true basis or a foundation; rather, it is an illusory anchor point.[2] The majority's interpretation of MCR 6.502(G)(2) elevates form over substance, allowing a defendant to satisfy the procedural requirements simply

---

[2] The majority itself acknowledges that defendant's sentence does not run afoul of *Miller* and *Montgomery*, going so far as to say that *Montgomery* explicitly tells us that defendant's challenge under the Eighth Amendment must fail. *Ante* at 7.

3

by citing a case with retroactive effect in a motion for relief from judgment, regardless of whether the caselaw relied on actually entitles the defendant to any relief.

Federal caselaw regarding the proper interpretation of the federal statutes governing habeas corpus review provides some helpful insight. Under 28 USC 2244(b)(2), a claim presented in a second or successive habeas corpus application must be dismissed unless the applicant meets certain criteria, one of which is that "the applicant [must] show[] that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable[.]" 28 USC 2244(b)(2)(A). If a three-judge panel of the appropriate court of appeals is satisfied that the prisoner's application has made a prima facie showing that one of the exceptions to the general rule against second or successive habeas corpus applications applies, it may allow the prisoner to file an application or motion in the district court. 28 USC 2244(b)(3)(B) and (C); 28 USC 2255(h).[3]

There is currently a split among the United States Courts of Appeals with respect to what "relies on" means for purposes of habeas corpus applications. See generally Means, Federal Habeas Manual, § 11:36 (May 2022 update). The Third Circuit has taken the most liberal approach, permitting a nonfrivolous extension of a rule to be certified, while leaving the ultimate decision on the merits for the district court. See *In re Hoffner*, 870 F3d 301,

---

[3] 28 USC 2244 applies to state prisoners, while 28 USC 2255 provides a similar procedure for federal prisoners who seek to have their sentences vacated or set aside. Although 22 USC 2255(h) does not contain the "relies on" language found in 28 USC 2244(b)(2), it contains an express reference to 28 USC 2244, and federal appellate courts have generally found that the "relies on" language applies to motions brought under 28 USC 2255. See, e.g., *In re Hoffner*, 870 F3d 301, 307 & n 9 (CA 3, 2017); *Donnell v United States*, 826 F3d 1014, 1016 (CA 8, 2016).

4

308 (CA 3, 2017) (holding that "whether a claim 'relies' on a qualifying new rule must be construed permissively and flexibly on a case-by-case basis").  However, even the Third Circuit's approach is not without limitations.  The rule relied upon need not "conclusively decide[]" the movant's claim, but it must "substantiate[] the . . . claim."  *Id*. at 309 (quotation marks and citation omitted; first alteration in original).  And while the movant can argue for a nonfrivolous extension of the rule, the "requested extension . . . cannot be so facially implausible that he is not really 'relying' on the new rule at all."  *Id*. at 311 (quotation marks and citation omitted).[4]

Other circuits have taken a narrower approach.  In particular, the United States Court of Appeals for the Eighth Circuit has rejected the argument that a movant can seek an extension of a new rule.  In *Donnell v United States*, 826 F3d 1014, 1016 (CA 8, 2016), it explained:

> A claim "relies on" a new rule when it is 'based on' a new rule . . . .  A claim is truly "based on" a new rule only when the new rule recognizes the right asserted.  See *Webster's Third New International Dictionary* 180 (defining "base" as "the fundamental part of something: ESSENCE, FOUNDATION").  Where a claim depends on recognition of a second new rule, the claim is best understood as relying on that second rule for a grant of relief.

I find the analysis in *Donnell* to be particularly persuasive, especially because the Eighth Circuit understood "relies on" to mean the same thing as "based on," that latter term being at issue in MCR 6.502(G)(2).  The relief defendant requested in his motion does not depend on recognition of the rule announced in *Miller* and made retroactive in *Montgomery*.

---

[4] The United States Court of Appeals for the Ninth Circuit, relying extensively on *In re Hoffner*, also found that requests for nonfrivolous extensions satisfy the "relies on" requirement.  See *Henry v Spearman*, 899 F3d 703, 706 (CA 9, 2018).

Rather, it depends on a rule that even the majority agrees is not found in those cases. The rule that the majority relies on to grant defendant relief was not in existence at the time defendant filed his motion. This fact is obvious, as it is in this very case that the Court has created a new rule that a parolable life sentence for a juvenile who commits second-degree murder violates our state Constitution.

I fear that the majority's interpretation of the court rule will incentivize criminal defendants to file increasingly meritless successive motions for relief from judgment, which will further burden our already backlogged trial courts. See *People v Anderson*, 508 Mich 971, 972 (2021) (VIVIANO, J., dissenting) (acknowledging the backlog of cases due to the COVID-19 pandemic). Unlike even the most generous interpretations of the federal habeas corpus statutes, the majority has imposed no discernable limitation on how tangential a case may be to the relevant new rule or how great of an extension would be necessary in order for a defendant to be entitled to relief. As a result, the trial courts will struggle to apply the majority's holding and, undoubtedly, much unwarranted postjudgment litigation will ensue.

I would deny leave to appeal under MCR 6.502(G). But even if defendant could overcome the procedural bar, I would conclude that his constitutional argument fails for the reasons stated by Justice ZAHRA. I therefore join Justice ZAHRA's dissent in every respect other than footnote 9.[5] For these reasons, I dissent.

David F. Viviano

---

[5] Because the rest of my colleagues have reached this question, it is appropriate for me to likewise indicate my view. See *In re Certified Questions*, 506 Mich 332, 414 & n 21; 958 NW2d 1 (2020) (VIVIANO, J., concurring in part and dissenting in part).

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                          No. 162425

MONTEZ STOVALL,

     Defendant-Appellant.

_____

CLEMENT, J. (*dissenting*).

I join Justice ZAHRA's dissent except for footnotes 24 and 25 and except insofar as it conflicts with my opinion in *People v Boykin*, ___ Mich ___; ___ NW2d ___ (2022) (Docket Nos. 157738 and 158695).

                                          Elizabeth T. Clement